GILLESPIE, Chief Justice:
Jerry A. Lott (plaintiff) sued MFC Services, a Corporation (defendant), for property damage, medical expenses and personal injuries. The jury returned a verdict for $175,000. Defendant appeals.
Plaintiff stopped his automobile in obedience to a highway traffic light. Defendant’s automobile, driven by its employee, Quick, struck plaintiffs automobile in the rear, knocking it forward over fifty feet. Plaintiff’s automobile was destroyed and plaintiff injured.
The only question requiring discussion is whether the verdict was so excessive that it was palpably against the preponderance of the evidence.
Lott’s health was excellent before the accident. Dr. Clayton S. Cook treated plaintiff at the hospital emergency room about 2:30 A.M., which was about two hours after the accident, and plaintiff was complaining of severe headache, neck pain, lower back pain, and pain in his right ankle where there was an abrasion. Dr. Cook stated that X-rays of plaintiff’s skull, cervical spine, lumbar spine, and right ankle revealed no fracture or dislocation. Dr. Cook referred plaintiff to Dr. Francis R. Conn, an orthopedic surgeon. Plaintiff was then put in traction but continued to have headaches and neck pain. A brain scan and electroencephalogram were inter *82 preted as normal. After six days in the hospital plaintiff was discharged.
Dr. Cook’s final diagnosis was cerebral concussion, acute cervical and lumbar strain, contusion of the head and right ankle. A week after plaintiff left the hospital he was still having considerable pain and his feet tended to go to sleep. About this time, plaintiff told Dr. Cook that he was seeing floating objects as he looked out and he was referred to an ophthalmologist. There is no testimony as to what, if anything, was found by the ophthalmologist.
Dr. Francis R. Conn, an orthopedic surgeon, first saw plaintiff while he was in the hospital being treated by Dr. Cook. He made the same complaints to Dr. Conn that he had made to Dr. Cook. Dr. Conn found limited motions of his neck and marked spasms of the posterior neck muscles, but the upper extremities did not reveal any abnormal reflexes. He found limited motion of plaintiff’s back in the lumbar region, with positive straight-leg-raising tests on the right side, indicating that something was pressing on the nerves in the back. Nineteen days after the accident, Dr. Conn saw and examined the plaintiff in his office and there was marked limited motion of his neck and lower lumbar spine. More X-rays were taken and no fractures were revealed. The doctor’s main finding at this time was marked limited motion of the back and neck, and plaintiff was given muscle relaxing drugs and also drugs for nervousness.
About a month after the accident, Dr. Conn again saw the plaintiff and he showed outward signs of nervousness and still complained of headaches and back pain. Two weeks later, he saw plaintiff, who made the same complaints, including the fact that his feet were going to sleep and some numbness in his hand. He was unable to get plaintiff to bend his back and he prescribed a back brace. At that time plaintiff held his back in a hyperextended (or swayback) position. Dr. Conn was of the opinion that plaintiff either had a continued nerve pressure or enough of a hy-perextension and flexion injury to cause some permanent scarring in the nerve route. Because of the generalized nature of the plaintiff’s physical complaints, Dr. Conn decided against doing a myelogram. Dr. Conn stated that plaintiff was unable to drive a large tractor-trailer truck, fly an airplane, or do farm work, and he thought his condition was permanent. Dr. Conn also stated that plaintiff might undergo surgery or a myelogram at a later date.
Plaintiff and his wife testified that after the accident the plaintiff stayed in bed a large part of the time; their lives changed completely; his personality changed; he was unable to do farm work, and he had not had a good night’s sleep since the wreck; that after the accident he had trouble swallowing; his back acted as if he had just played a football game; he was completely down in his back, and his condition grew worse; that he had black dots in his vision and occasionally suffered double vision; that after he got out of the hospital he had tremendous pain, could not turn his neck, and his feet would go to sleep. Plaintiff testified that his condition got worse as time went on, and when driving his truck, his legs would be paralyzed when he got out, and at night he would be extremely nervous, upset and in bad pain; that he was not able to drive a truck after August 26, 1973, because of the pain and physical disability.
The accident occurred on February 3, 1972. At the time of trial, plaintiff was 35 years old, had a B.S. degree in mathematics, married, and had two children. He was in the Naval Service from 1961 to 1970, and remained in the active reserve after leaving the Navy as a qualified pilot. As an active Reservist, plaintiff received $174 per month, and it was necessary for him to request a release from the Navy after his accident. At the time of his injury, plaintiff was an independent truck operator, owned a 1971 GMC-6500 series *83 truck, and made approximately $600 per month profit out of his trucking operation. He testified he was in the cattle business on a partnership basis with his father, worked on the farm in this connection, and earned about $2,000 a year from the business. He sold his cattle in order to have funds to live on after the .accident. On May 16, 1972, three and one-half months after the accident, plaintiff returned to the trucking business and drove a smaller truck for one month; during this time he was unable to make two trips per day as he had done before the accident. After reaching his destination, he would have to lie down while the truck was being loaded because his back and legs would become numb. He operated about a month and earned approximately $250.
He bought a larger truck for $35,500, and began driving it on June 17, 1972. It had sleeping accommodations where he could rest. He was only able to drive four days .a week, whereas before the accident he had driven six days a week, and for the fourteen months that he operated this large truck, he realized from $100 to $150 less profit per month than before he was injured. During this fourteen-month period, his physical condition grew worse. After several hours of driving his leg would be paralyzed, and sometimes he fell when he got out of the truck, and when he got home at night, he would be nervous, upset and in pain. He said that after the fourteen-month period he was unable to do any farm work. In August, 1973, five or six months before the trial, he gave up driving the big truck and sold it for $18,000.
Dr. Cook’s bill was $65.00; the hospital bill was $625.25; the pharmacist’s bill was $167.42; the bill for the back brace was $73.50; and Dr. Conn’s bill was $760.00, or a total of $1,691.17 medical expenses. His automobile was damaged to the extent of $875.00.
The Court is of the opinion that, considering the present value of the dollar, the extent of the plaintiff’s injuries, his special damages, and the probabilities of his future disability, the proof does not justify a verdict of $175,000. We find that the verdict is palpably against the preponderance of the evidence. This Court has said many times that it is reluctant to disturb a jury verdict, especially where pain and suffering are involved. Nevertheless, in Employers Mutual Casualty Co. v. Ainsworth, 249 Miss. 808, 164 So.2d 412 (1964), this Court said:
Throughout our history the Court has found it necessary from time to time to set aside verdicts of the jury in order to preserve the integrity of the right to trial by jury and to see to it that litigants have the kind of jury trial contemplated by the Constitution, for every Constitutional Convention has adopted the same language used in the Constitution of 1817 with full knowledge that in the cases under the Constitution of 1817 the Court construed the guarantee of the right to jury trial as subject to the rule that a verdict would be set aside when “found palpably against the preponderance of evidence.” 249 Miss. at 824-25, 164 So.2d at 419.
The relatively small amount of the hospital and medical expenses is one factor that must be taken into consideration. Others include the generalized nature of the plaintiff’s physical complaints, the absence of any fracture, and the fact that a myelogram was not done. The Court also must consider that the plaintiff is not dependent upon manual labor to earn a living. He is an educated man, obviously capable of performing work other than heavy manual labor. The $600 that the plaintiff stated he made from his trucking operation included the value of his services and the profits made on his investment in the truck. The Court fully realizes that some of these matters can not be made more definite, and that the plaintiff undoubtedly received some permanent injuries.
In order to provide some possible basis for the disposition of this case without a *84 new trial on the issue of damages, the Court suggests a remittitur of $75,000. It is appropriate for the Court to again emphasize that it is not undertaking to fix the damages but is only giving the plaintiff the option of entering a remittitur and accepting a final judgment in this Court of $100,000, or receiving a new trial on the issue of damages only.
If the plaintiff exercises his option to enter the remittitur of $75,000 within fifteen days from the date this judgment becomes final, judgment will be entered here for $100,000, and the case affirmed for that amount, otherwise the case will be reversed and remanded for a new trial on the issue of damages only.
Affirmed on condition of remittitur.
RODGERS, P. J., and PATTERSON, INZER, SUGG, WALKER and BROOM, JJ., concur.