416 So.2d 659 (1982)
Jerry A. WOODS, William C. Boteler,[1] Alfred E. Corey,[2] Executor of the Estate of Russell D. Corey and Charles T. Kyles, Nancy Anderson and Larry T. Brooks
v.
Ronald D. NICHOLS.
No. 52684.
Supreme Court of Mississippi.
June 30, 1982.
Rehearing Denied July 28, 1982.
*660 *661 Wells, Downey & Wicker, John H. Downey, Watkins & Eager, Thomas M. Murphree, Jr., Heidelberg, Woodliff & Franks, Sam E. Scott, John B. MacNeill, Jackson, for appellants.
King & Spencer, Larry Spencer, Daniel, Coker, Horton & Bell, Terry R. Levy, Jackson, for appellee.
En Banc.
WALKER, Justice, for the Court on Parts I, II and III.
ROY NOBLE LEE, Justice, for the Court on Parts IV and V.
This is an appeal from the Circuit Court of the First Judicial District of Hinds County wherein appellee, Ronald D. Nichols, was awarded the sum of $550,000 as a result of an automobile accident. The suit grew out of an accident that occurred on January 31, 1979, on U.S. Highway 49 approximately two miles north of Flora. At that time Highway 49 was a two-lane highway.
The accident occurred on what is known as the Big Black River Bottom, a level stretch of highway with three bridges. The accident occurred between the first and the second bridge approximately one-fourth of a mile north of the first bridge. It is undisputed that this area is straight and flat and that there are no obstructions to a person's view for more than a mile.
Plaintiff Nichols was driving a United Parcel van in a northerly direction along Highway 49. Defendant, Larry Brooks, *662 was driving a Chevrolet Nova in a southerly direction meeting the plaintiff. The Nova was owned by the defendant, Nancy Anderson. The accident occurred in the northbound lane of the highway across from and approximately at the rear end of a disabled tractor-trailer parked facing south on the west side of the highway. The rear wheels of the tractor-trailer rig extended approximately eighteen inches onto the paved portion of the highway. The defendant, Charles Kyles, was following the plaintiff Nichols in a Boteler and Corey Sausage delivery truck.
As Nichols and the defendant, Brooks, approached the parked tractor-trailer from opposite directions  Nichols going north and Brooks coming south  Brooks suddenly veered from the southbound lane of traffic into Nichols' northbound lane and collided with the front end of Nichols' United Parcel Service van. The impact almost totally demolished the Nova, and the impact to the cab of Nichols' van was so severe that the van flew into the air and landed on the highway on its left side. The sausage truck driven by the defendant, Kyles, then struck the United Parcel Service van as Kyles veered to the left in an attempt to avoid colliding with the van.
As a result of the accident plaintiff Nichols sustained serious and permanent injuries. Plaintiff contended in his suit that the operator of the Nova automobile, the sausage delivery truck and the parked tractor-trailer were negligent, and, in combination, directly and proximately caused his injuries and that all drivers, and other defendants, were jointly and severally liable.

PART I.

LIABILITY OF LARRY BROOKS
The evidence and testimony in this case is undisputed that the Nova vehicle driven by Larry Brooks suddenly veered across the center line into the northbound lane of traffic and collided head on with the United Parcel van driven by the plaintiff Nichols.
Brooks does not question his liability in his brief, but does contend that the trial court erred in failing to grant him a mistrial following alleged prejudicial comments by the court while he was being cross-examined. The brief charges that every party in the case, with the exception of Anderson, sought to blame the accident entirely on him. The brief points out that Brooks was questioned and requestioned about incidental details, distances, times, places, etc. An objection was interposed by plaintiff's counsel to the questioning suggesting that such repetitious questioning had no probative value. Whereupon, the trial judge, referring to Brooks' testimony, stated that the court did not blame counsel for Brooks' response, "because the more we ask these questions, the different answers we are getting, and we're getting nowhere with them."
We have carefully considered this assignment of error and are of the opinion that when the statement is taken in the context of all of the preceding questioning and the fact that Brooks' negligence was proven overwhelmingly, that although it was unfortunate the comment was made, it does not constitute reversible error. With or without the trial court's comment, the plaintiff was entitled to a peremptory instruction against Brooks on the evidence in this record.
AFFIRMED AS TO THE LIABILITY OF LARRY BROOKS.
PATTERSON, C.J., SUGG and SMITH, P.JJ., and BROOM, ROY NOBLE LEE, BOWLING, HAWKINS and DAN M. LEE, JJ., concur.

PART II.

LIABILITY OF NANCY ANDERSON
The appellee Nichols charged in his declaration that Nancy Anderson was the owner of the Nova and Larry Brooks was driving the automobile with the full permission and consent of Nancy Anderson and as her agent.
It is undisputed that Mrs. Anderson owned the Nova automobile which was being driven by Brooks on a trip to Jackson *663 from Yazoo City. Brooks was accompanied by his aunt, Mrs. Maybelle Johnson. Mrs. Maybelle Johnson was also the aunt of Nancy Anderson. Nancy Anderson and Brooks were cousins.
Mrs. Anderson was a resident of Chicago, Illinois, and had bought the Nova for her personal use while on visits to Mississippi. She had first left the vehicle with her mother who resided at a residence on Lynch Street in Jackson. After her mother's death, she left the Nova with her aunt, Mrs. Maybelle Johnson, who lived in Yazoo City. Nancy Anderson owned rental property in Yazoo City which Mrs. Johnson looked after and collected rents from the tenants. Mrs. Anderson also owned the mother's former home on Lynch Street in Jackson.
It is undisputed that Mrs. Maybelle Johnson had two children and a grandchild living at the Lynch Street house. These family members did not pay rent to Mrs. Anderson.
There was also vague testimony from Brooks that there were several students from Jackson State University who lived on the property as renters.
Mrs. Anderson testified, by deposition, that Mrs. Johnson only collected rents on the Yazoo City properties and that she did not collect rents on the Lynch Street property. She further testified that Mrs. Johnson frequently went to Jackson to visit her children who lived at the Lynch Street address.
Mrs. Anderson described her arrangement with Mrs. Johnson's children as being one whereby the children did not pay rent on the property and that any rent that they collected from others was to be used by them for the upkeep of the house.
In any event, there is no evidence in the record to support a finding that Mrs. Johnson was on her way to the Lynch Street property in Jackson to collect rents for Mrs. Anderson on the day of the accident. The only testimony with regard to the collection of rents came from the defendant, Brooks, who testified that he and Mrs. Johnson went to the Lynch Street property on Wednesday or Thursday of the week before the wreck to collect rent. Brooks also testified that in addition to driving Mrs. Johnson to Jackson at her request, he was going to attempt to take care of some personal matters between 3:00 and 5:00 that afternoon. When asked what kind of work he planned to do at 504 Lynch Street, his reply was "Ordinarily, she was going to do some sweeping and do some washing, dishes, furniture, moving around the furniture, checking on lighting fixtures. My tasks were if I knew how to put in, hookup a light, put in a light, go out into the yard and pick up garbage. And in January I was going to be doing some yard cleaning, primarily, and doing some climbing up in the attic and sorting through old things and getting a lot of the old furniture or old papers out of the attic in different rooms."
If there is any liability on the part of Mrs. Anderson for the injuries sustained by the plaintiff Nichols, it must necessarily be predicated upon an agency relationship existing between Mrs. Anderson and Mrs. Johnson and the sub-agency relationship of Brooks as the driver of the Nova at the request of Mrs. Johnson, who could not drive.[3]
Therefore, the underlying question with regard to the liability of Mrs. Anderson is whether, under the facts presented by this record, there was a jury issue made as to whether Mrs. Johnson was about the business of Mrs. Anderson, pursuant to Mrs. Anderson's authorization, either express or implied, or whether Mrs. Johnson was going to Jackson for her own personal reasons, such as visiting her children who lived at the Lynch Street address when the accident occurred and in which Mrs. Johnson was killed.
There is no evidence of any agreement between Mrs. Anderson and Mrs. Johnson with respect to the Lynch Street property. To the contrary, Mrs. Anderson testified that Mrs. Johnson did not collect rents from *664 the Lynch Street property nor look after it. The testimony of Brooks that ordinarily she would "do some sweeping and do some washing, dishes, moving around the furniture, checking on light fixtures" and that he would pick up the garbage and clean up the yard is more consistent with the theory that Mrs. Johnson was visiting the Lynch Street property for the purpose of visiting and looking after her children who lived there. It would be most unusual for a landlord to do sweeping, washing, and dishes under the usual rental arrangements; and, there is no testimony in this record to support any unusual arrangement between Mrs. Anderson, the renters and Mrs. Johnson.
The burden of proving an agency relationship is upon the party asserting it, in this case the plaintiff Nichols. U.S. Fidelity & Guaranty Co. v. Arrington, 255 So.2d 652 (Miss. 1971); Highlands Ins. Co. v. McLaughlin, 387 So.2d 118 (Miss. 1980). It is an elementary principle of law in this State that a mere permissive user of a motor vehicle does not in and of itself create an agency relationship; and, there is no vicarious liability of the automobile owner for the permissive user's negligently caused injuries and damages to a third person. Atwood v. Garcia, 167 Miss. 144, 147 So. 813 (1933); Merchants Co. v. Tracey, 175 Miss. 49, 166 So. 340 (1936).
Upon a review of the record with respect to whether an agency relationship existed between Mrs. Anderson and Mrs. Johnson with respect to the Lynch Street property and whether Mrs. Johnson was acting as Mrs. Anderson's agent on the day of the accident, we are of the opinion that any such evidence amounts to a mere scintilla, if that much. We are of the further opinion that no issue of agency was sufficiently made for a jury to determine. Therefore, Mrs. Anderson was entitled to a peremptory instruction, and the court should have sustained her motion for a judgment notwithstanding the verdict.
REVERSED AND RENDERED AS TO THE LIABILITY OF NANCY ANDERSON.
PATTERSON, C.J., SMITH and SUGG, P. JJ., and BROOM, ROY NOBLE LEE, BOWLING, HAWKINS and DAN M. LEE, JJ., concur.

PART III.

LIABILITY OF BOTELER AND COREY AND ITS AGENT, CHARLES T. KYLES
Nichols charged in his declaration that the defendant, Charles T. Kyles, driver of the sausage truck, was negligently following too closely, did not maintain a proper lookout, did not maintain control of his vehicle and negligently struck the disabled van occupied by Nichols after the initial collision between the United Parcel van and the Nova automobile.
Kyles, the driver of the sausage truck, and his employer, Boteler & Corey, will be collectively referred to hereinafter as Kyles. As to Kyles' involvement in the accident, the record reveals that the plaintiff Nichols, operating a United Parcel van with a fiber glass cab, passed Kyles' sausage truck as it proceeded north, approximately one-fourth of a mile south of the accident. Kyles was driving at a steady 55 miles per hour rate of speed when Nichols passed and pulled in front of him as both vehicles continued northward. Kyles continued to maintain a 55 miles per hour rate of speed as Nichols gradually pulled away creating a three to four car lengths distance between the two vehicles just before the accident occurred. The elapsed time from the time that Nichols passed Kyles to the point of collision was approximately 16.5 seconds.
As stated earlier, prior to reaching the first bridge, which was approximately one-fourth of a mile from the accident scene, Nichols and Kyles saw the tractor-trailer rig parked facing south on the west side of the highway opposite their northbound lane. Nichols had also seen the truck in the same position the day before the accident. Nichols was aware of the approaching southbound Nova vehicle driven by Brooks. Defendant Kyles was unaware of the approaching *665 Nova, evidently because of the large United Parcel van in front of him. Plaintiff Nichols testified as follows:
Q. All right. When did you first observe a car [the Nova driven by Brooks] approaching from the north?
A. After I had completed my pass around the grain [sic  sausage] truck.
Q. All right now, where was that car with respect to the center of the highway when you first observed it?
A. He was on his side of the road.
Q. All right. What if anything was that car doing that appeared unusual or that called your attention to it in any special way?
A. Nothing.
Q. All right. And as you were approaching the grain truck, at what speed were you traveling?
A. Around fifty, between fifty and fifty-five.
Q. All right. Now, what, if anything, did you do as you came nearer to the grain truck?
A. I let off my accelerator a little bit.
Q. And why did you do this?
A. To slow down a little bit because of the coming situation. The grain truck was out a little bit.
Q. All right now, at that time, had the oncoming vehicle done anything unusual?
A. No sir.
Q. All right. Then tell the jury if you will, Ron, what next occurred.
A. Well, just all of a sudden the Nova just came over in my lane, and I slammed on brakes and tried to turn to the right, and that's all I remember.
Q. All right. And when the Nova  and this is the vehicle driven by Larry Brooks?
A. Yes sir.
Q. All right. When it came over in your lane, how did it come over there?

A. Quickly, suddenly. Just all of a sudden he just zipped over.

Q. All right. And you did what?
A. I just slammed on brakes and tried to turn to the right to get out of his way. (Emphasis added).
Q. All right now, at the time he came over in your lane, do you know where you were with respect to the disabled trailer on the shoulder of the road?
A. I imagine I was about seventy-five feet this side, south side of the trailer.
Q. You had not gotten to the trailer?
A. No sir.
Q. Had he gotten to the trailer?
A. No sir.
Q. Could you estimate how far north of the trailer he was when he zipped over in your lane, as you call it?
A. Probably around a hundred feet.
Q. All right. So then how far apart would you say ya'll were when he zipped over in your lane?
A. Around two-hundred feet.
Q. All right. And after you saw him zip over in your lane and applied your brakes and pulled to your right, then what happened?
A. That's all I remember.
Q. That's all you remember?
A. Yes, sir.
Q. All right. What is the next thing you remember after putting on your brakes and pulling to your right?
A. I came to and I was laying on the highway. They had already gotten me out of the truck. When I came to, I saw a lot of people standing around, and then I guess I blacked back out.
Q. All right. The last time you remember seeing the Chevy Nova, how was it coming at you?
A. Straight at me, just bearing down at me.
The defendant Kyles was called by plaintiff as an adverse witness and testified as follows with respect to the collision:
Q. As you were following along behind this UPS van, maintaining your fifty-five mile an hour speed, three, four car lengths behind him, and approaching this disabled van on the shoulder of the road, what is the first thing you noticed that made you know something wasn't right?

*666 A. The first thing I noticed that made me know something wasn't right was when I seen this UPS van going in the air and all the debris flew from it and the door flew off of it and it turned over.
... .
Q. All right. Now, what did you do when you finally determined that something had gone wrong up there?
A. Tried to dodge it, tried to stop, tried to dodge it.
Q. All right now, did you apply your brakes?
A. Yes sir.
Q. And how far away from him were you when you applied your brakes?
A. I don't know, sir.
Nichols was unable to avoid the Nova driven by defendant Brooks, which had crossed into Nichols' lane of traffic. The resulting collision virtually destroyed the United Parcel van's cab and the Nova automobile. Kyles veered to the left to avoid hitting the United Parcel van but was unsuccessful and struck some part of the van.
Was appellant Kyles entitled to a peremptory instruction and, failing that, a judgment N.O.V.?
The general law with respect to following vehicles is summed up in Blashfield, Automobile Law and Practice (3d ed.) section 113.15, (1979) which states, in part, as follows:
Duties  following vehicle  maintain reasonable distance.
Under the provisions of some statutes the express duty of the driver of a following vehicle is to not follow more closely than is reasonable and prudent, having due regard to the speed of such vehicles and the traffic upon and condition of, the highway. [Same as our statute, Miss. Code Ann. § 63-3-619(1)(1972)].[1]
... .
Statutes or rules of the road which require the maintenance of distance by one vehicle following another are not rendered inapplicable by the mere fact that the following vehicle is not directly in the rear of the leading vehicle, but do not apply where the following vehicle is overtaking and passing the leading vehicle, or is in another lane.
... .
Hard-and-fast or general rules do not exist as to how close a motorist, in the exercise of ordinary care, should follow another vehicle, and the only rule that can govern the interval to be maintained is that of reasonable care under the circumstances. The mere fact that a vehicle travels in close proximity to a moving vehicle ahead does not necessarily constitute negligence.
The driver of a following vehicle is not to be charged with anticipating an emergency created by the negligence of another under circumstances that could not have been reasonably anticipated. Exonerating circumstances may be when the vehicle immediately ahead collides with another vehicle or object... . (Emphasis added).
[1] (1) "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." Appellee Nichols does not contend that subsection 2 is applicable to the facts in this passing situation. It provides as follows: "The driver of any motor truck or motor truck drawing another vehicle when traveling upon a roadway outside of a business or residence district shall not follow within three hundred feet of another motor truck or motor truck drawing another vehicle. The provisions of this subsection shall not be construed to prevent overtaking and passing nor shall the same apply upon any lane specially designated for use by motor trucks."
That fact that plaintiff Nichols passed Kyles and thereby placed Kyles in a close following position presents two questions: (1) After being passed by Nichols, was Kyles under a duty to immediately decrease his speed? We think not. For a vehicle to immediately slow down after being passed could, in itself, create a hazardous condition to traffic to the rear. From common practice and experience we can safely say that a driver who is passed on the highway, under ordinary circumstances, maintains his speed while the passing vehicle *667 moves on ahead creating a distance between them. This of necessity takes time, the amount of time depending on the speed of the two vehicles. We would add, however, that at some point, if the passing vehicle does not create a distance between the two vehicles that would be reasonable, the passed vehicle must either slow until a reasonable distance is created or elect to repass the original passing vehicle. (2) The next question is whether the tractor-trailer rig which was disabled and parked on the west shoulder of the highway with approximately eighteen inches extending onto the paved portion of the highway, created a special hazard which required Kyles, in the exercise of reasonable care, to immediately slow his vehicle after being passed by the United Parcel van? Again, we think not. All of the testimony is to the effect that there was ample room for a southbound vehicle such as the Nova to pass the parked disabled truck without crossing the center line, while meeting oncoming traffic in the northbound lane. In fact, Nichols had traveled this highway the day before the accident and had seen the disabled truck and testified that although the rear dual wheels of the truck protruded onto the highway, there was ample room for vehicles meeting one another to pass without any problem. The defendant Brooks also testified that there was ample room for him to have passed between the truck and oncoming traffic without crossing the center line and was unable to explain why he suddenly veered into the path of Nichols' United Parcel van. Brooks' relevant testimony is as follows:
Q. So that's the last thing you remember?
A. That's the last thing I remember, with the exception of, as I said, this silver streak, I said in the deposition given in October, came across my right hand. I don't know what this silver streak was.
Q. When you were last conscious, you were approaching then the grain truck and you were moving to the left.
A. No, I was not moving to the left. I was at the position at which I was reasonably safe. I was no longer moving.
Q. Well, where were you?
A. I was going straight ahead.
Q. In whose lane?
A. My lane.
We are of the opinion that under the circumstances presented, no special hazard existed on the highway which would require a person in the exercise of reasonable care to immediately decrease the speed of his vehicle after being passed by another vehicle. Therefore, since the defendant, Kyles, was under no duty to immediately decrease the speed of his vehicle after being passed by Nichols' United Parcel van, in order to allow an interval to be created between them, and, since Nichols, by passing Kyles, created the short distance between himself and Kyles and 16.4 seconds later collided with the Brooks' vehicle (Nova) which suddenly and without cause or reason veered into Nichols' lane of traffic, creating a situation that was not reasonably anticipated, Kyles was not guilty of any negligence which proximately caused or contributed to Nichols' damages and injuries.
As to whether Kyles reacted to the situation in a reasonable manner under the circumstances, we need only look to the undisputed facts. At the time the United Parcel van collided with the Nova, Kyles was three to four car lengths behind the United Parcel van traveling at 55 miles per hour. Nichols "slammed on brakes" and collided with the Nova. Kyles saw the van "going in the air and all the debris flew from it and the door flew off of it and it turned over." Kyles put on brakes, skidded and veered to the left in an attempt to miss the van but was unsuccessful. One could hardly do more under the circumstances.
For the above reasons, we are of the opinion that the trial court should have sustained Kyles' motion for a judgment notwithstanding the verdict.
REVERSED AND RENDERED AS TO THE LIABILITY OF BOTELER AND COREY AND ITS AGENT, CHARLES T. KYLES.
*668 PATTERSON, C.J., SMITH and SUGG, P. JJ., and BROOM and ROY NOBLE LEE, JJ., concur.
BOWLING, HAWKINS and DAN M. LEE, JJ., dissent.

PART IV.

LIABILITY OF JERRY A. WOODS
Nichols charged in his declaration that Woods was negligent in leaving his disabled vehicle protruding into and partially blocking the travelled portion of the highway for an unreasonable length of time and that such negligence proximately contributed to the cause of the accident and resultant injuries and damages suffered by Nichols.
The tractor-trailer driven by Woods was loaded with soybeans. The rig was thirty-eight (38) feet long and had a gross weight of 71,020 pounds. The load of beans was so heavy that the trailer broke in half and Woods attempted to drive the rig off on the west shoulder of the highway. The shoulder was wet and muddy and he was unable to do so, leaving the trailer approximately eighteen (18) inches on the west side of the paved portion of the highway and partially blocking it. The time was approximately 2:00 a.m. on Tuesday, January 31, 1979. Woods spent the remainder of that night at a 24-hour truck stop and did not remove the rig from the highway before the collision occurred at approximately 9:30 a.m. Wednesday, February 1, 1979, approximately thirty-one and one-half (31 1/2) hours later.
The evidence is uncontradicted that while the Brooks Nova automobile was in the vicinity of the Woods soybean truck, it suddenly veered to the east across the centerline into the path of the Nichols vehicle. Brooks testified that he first saw the truck-trailer when he was between a quarter of a mile to a half-mile away.[4] He further testified, in part, as follows:
Q. O.K. Mr. Brooks, go ahead. I want to find out exactly how this wreck happened.
A. And as I was approaching the eighteen-wheeler I moved over slightly to my left to insure that the right-hand passenger side on which my aunt was driving [riding] would not go into the eighteen-wheeler, which was sticking in our line. And at the same time the eighteen-wheeler was situated near a big, ole gully. Just in case something strange happened, I didn't want to be on that side of the gully. So at the same time it was two objects coming toward us. O.K. It appeared that one of the objects was passing the other object. And as we were approaching the eighteen-wheeler, I was approaching the eighteen-wheeler, and the markings were saying  I don't know whether they were flashing or whether they were little triangles, but I knew that the eighteen-wheeler was not moving, and I clicked on my blinkers or flashed my headlights on and off like you're driving at night and someone is passing and they're coming at you and you flash the light on to say you're there, slow down, back it up, get back in, because there's originally not enough chance, me going at my speed and you going at your speed, so we can both get through that square. And as I put my blinkers on, instinct or something told me to move a little bit closer and see what was going on. And as I moved to see what was going on, I said, "What the hell?" And when I said "hell," I woke up in the hospital.
Q. So that's the last thing you remember?
A. That's the last thing I remember, with the exception of, as I said, this silver streak, I said in the deposition given in October, came across my right hand. I don't know what this silver streak was. (Emphasis added).
The photographs indicate that the tractor-trailer was a huge and imposing rig and appeared to block more than the west eighteen *669 inches of the paved portion of the highway. Brooks was concerned for the safety of his aunt who was sitting on the passenger side, due to the presence of the tractor-trailer, and he drove to his left. The fact that the tractor-trailer was near a big gully also gave him concern for her safety. It is undisputed that he moved away from the stalled rig toward the east. The evidence is also undisputed that the Nova then suddenly crossed the centerline into the northbound lane.
The jury and the court can apply their own experience and knowledge in driving and meeting situations on highways. It is a matter of common knowledge that the driver of a vehicle approaching another vehicle stopped on the edge of the pavement, or on the shoulder, almost subconsciously will drive to his left in order to place distance between his vehicle and the stopped vehicle and such is true even on an interstate highway. The question arises here as to whether or not Woods reasonably should have foreseen that some accident may have occurred as a result of the tractor-trailer's being stopped on the highway, even though he may not have foreseen the specific accident which did occur. If an approaching vehicle had driven into the southbound lane in which Brooks was driving the Nova, forcing Brooks to drive within six (6) inches of the west edge of the pavement thereby causing him to hit the tractor-trailer parked there, resulting in injury to him, could it be said that Woods was not contributorily negligent? If he would be negligent under those facts, why should he not be negligent under the present facts?
In Belk v. Rosamond, 213 Miss. 633, 57 So.2d 461 (1952), one Wiley left a disabled automobile parked on the south side of a bridge approximately one hundred fifty (150) feet from the west end of it. The Rosamond automobile was proceeding westwardly on the bridge, left the north lane of travel and ran into the Wiley vehicle. In holding Wiley liable, the Court said:
Frank Wiley, Jr., admitted that he had left his stalled automobile on the bridge from 4:30 o'clock a.m. until the midafternoon without taking any effective action to remove it from the bridge, although he had made two trips back to the stalled car during the morning. The fact that the bridge was 19 feet 3 inches in width and that approximately 13 feet of the traveled portion of the bridge remained unobstructed did not relieve him from the duty of taking prompt and effective action to remove the automobile from the bridge without unreasonable delay so as to avoid the danger created by the parking of the automobile on the bridge.
In case a motor vehicle is disabled on the public highway so that is [sic] cannot be moved under its own power, if it can be removed from the traveled portion of the highway, it is the duty of the driver to so remove it. Keller v. Breneman, 153 Wash. 208, 279 P. 588, 67 A.L.R. 92. [213 Miss. at 643, 57 So.2d at 465].
This Court, in Paymaster Oil Mill Company v. Mitchell, 319 So.2d 652 (Miss. 1975) cited General Tire & Rubber Co. v. Darnell, 221 So.2d 104 (Miss. 1969), and stated the principle that applies to motions for directed verdicts, judgments n.o.v., and requests for peremptory instructions as follows:
The established rule is when the court considers whether the defendant is entitled to a judgment as a matter of law, the court should consider the evidence in the light most favorable to plaintiff, disregard any evidence on the part of defendant in conflict with that favorable to plaintiff, and if the evidence and reasonable inferences to be drawn therefrom would support a verdict for plaintiff, the jury verdict should not be disturbed. 221 So.2d at 105. [319 So.2d at 657].
We are of the opinion that, applying the principle expressed above to the facts and inferences in this case favorable to the appellee, there was a question for the jury to determine as to the liability of Woods, and we affirm on liability.
AFFIRMED AS TO THE LIABILITY OF WOODS.
SUGG, P.J., and BOWLING, HAWKINS, and DAN M. LEE, JJ., concur.
PATTERSON, C.J., SMITH, P.J., and WALKER and BROOM, JJ., dissent.

*670 PART V.

EXCESSIVENESS OF DAMAGES
All of the appellants assigned as error the verdict of the jury was excessive and was not supported by the evidence. It can hardly be questioned however that Nichols has suffered serious, permanent and crippling injuries, whereas prior to the accident, he was a healthy, active twenty-eight year old male.
A summary of his injuries are as follows: A laceration on the left side of the scalp, two lacerations on the right side of his face, and a laceration on his left ankle; dislocation of the right elbow and the right ulna broken in four places; a deep laceration in the web between the thumb and index finger on his right hand and loss of tissue on his thumb, long and ring fingers (the lacerated fingers required skin grafting, and one finger is disfigured); a two to three-inch laceration on his left leg near his knee; a front tooth knocked out, requiring a three-part bridge; a large wound from the kneecap to the back of his right leg with the upper four inches of the tibia being pulverized; a fracture of the fibula and comminuted fracture of the femur.
An attempt to repair the broken bones with pins and screws was unsuccessful. Complications involving gangrene, dead tissue or attempted skin grafts necessitated that Nichols be carried to the operating room on several occasions over the next few days. It was finally determined that since large amounts of muscle and bone had died and there was danger that Nichols could bleed to death from a torn artery, it would be necessary to amputate his right leg four to six inches above the knee. During the course of his stay in the hospital, Nichols had numerous blood transfusions, his right arm placed in a cast and later in a brace, and he received physical therapy treatments. Motion in his right wrist is permanently limited to ninety degrees, and his right forearm healed with a permanent fifteen-degree angulation.
Appellee was in the hospital forty-eight days, six days of which were in intensive care. Medical expenses totalled $25,914.91. He was off work for a year and eight weeks (60 weeks). He has lost between $26,000 and $27,000 in wages.
At the time of the accident Nichols was working 45 hours a week driving a United Parcel Service van earning $9.40 an hour for the first forty hours and time and a half for overtime. At the time of trial, truck drivers doing the same work were making over $11.00 an hour. Nichols has returned to work but now does office work since he can no longer drive a truck. He is now earning $1,950.00 per month; therefore, at the time of the trial, he was making approximately $1,680.00 less per year doing office work that he would have been making as a truck driver.
It is evident that Nichols experienced great pain and suffering as a result of the collision, during his hospitalization and that he still has some pain. He is unable to walk over rough terrain, must take stairs one at a time, cannot drive a standard vehicle, cannot run, cannot engage in some social activities and testified that he no longer is able to shoot a gun or hunt with a bow or ski. He also testified that he has difficulty eating normally with his right hand.
Nichols described his prosthesis (artificial leg) as being hard to wear, hurts to walk on it, and causes blisters and boils. When blisters or rashes appear, Nichols has to take off the prosthesis and get about on crutches or by wheelchair. Dressing is difficult.
The doctor testified that fungus infections are common complications that amputees have because the fiber glass "stump" does not breathe. They are prone to get skin infections such as painful boils and pimples, which may ordinarily be considered insignificant, but means to an amputee that he leaves his prosthesis home and uses crutches.
The orthopedist testified that Nichols' artificial leg will have to be replaced every two to five years at today's cost of $2,400.00. Concerning probable future problems, the doctor said, "I never discharge an amputee."
*671 The question here is whether the jury verdict of $550,000 is so grossly excessive as to evince passion, bias and prejudice on the part of the jury.
Some of the elements that may be considered by the jury in fixing the amount of damages suffered by a plaintiff include: the degree of physical injury, mental and physical pain, present and future, temporary and permanent disability, medical expenses, loss of wages and wage-earning capacity, sex, age and plaintiff's state of health, Mobile & Ohio Railroad Co. v. Carpenter, 104 Miss. 706, 61 So. 693 (1913); Kinnard v. Martin, 223 So.2d 300 (Miss. 1969); the loss of use of limbs, Memphis & C.R.R. Company v. Whitfield, 44 Miss. 466 (1870); Grenada Dam Contractors v. Patterson, 48 So.2d 480 (1950); disfigurement or mutilation of the body, Vascoe v. Ford, 212 Miss. 370, 54 So.2d 541 (1951); Rankin County v. Wallace, 230 Miss. 413, 92 So.2d 661 (1957); Jenkins v. Cogan, 238 Miss. 543, 119 So.2d 363 (1960). With regard to the impact of inflation and change in the purchasing power of money and cost of living, see Kinnard v. Martin, 223 So.2d 300 (Miss. 1969) and Shaw v. Richardson, 392 So.2d 213 (Miss. 1980).
In Walters v. Inexco Oil Company, 511 F. Supp. 21 (1979), Walters, a Mississippi citizen, filed suit in the United States District Court for the Southern District of Mississippi seeking damages for personal injuries received in an oil well accident. His principal injury was loss of his right leg above the knee. District Judge Walter L. Nixon, sitting without a jury, awarded damages in the sum of $534,116.54. The judgment was affirmed by the Fifth Circuit Court of Appeals on February 2, 1981 [Not Yet Reported]. While Walters sustained larger damages for medical expenses and loss of earnings, that case and the case sub judice are comparable.[5]
In Kinnard v. Martin, supra, Martin sustained serious leg injuries and was awarded $100,000 damages. This Court said:
We cannot, however, agree that the verdicts of the jury are so excessive as to evince bias and prejudice on the part of the jury. It is true that the amount is large in each case, but the hospital and medical expenses in Mr. Martin's case were shown to have been $5,559.42, and in Mrs. Martin's case, $6,466.20. Hospital and medical expenses have more than doubled in the last two years, but it is not contended here nor has it been contended in the cases which have been before this Court that they were excessive. It is true that just a few years ago a judgment for half the size of these verdicts would have been considered excessive, but that was before 5¢ magazines sold for 50¢ and $25 suits sold for $100.
The jury has a right to consider any change in the purchasing power of money and the cost of living. Louisville & N.R.R. v. Williams, 183 Ala. 138, 62 So. 679 (1913); Annot., 12 A.L.R.2d 611, § 11 at 636 (1950); 22 Am.Jur.2d Damages §§ 87, 365 (1965).
* * * * * *
Each suit for personal injury must be decided by the facts shown in that particular case. The amount of physical injury, mental and physical pain, present and future, temporary and permanent disability, medical expenses, loss of wages and wage-earning capacity, sex, age and health of the injured plaintiff, are all variables to be considered by the jury in determining the amount of damages to be awarded. Mobile & Ohio R.R. v. Carpenter, 104 Miss. 706, 61 So. 693 (1913); Southern R.R. v. Kendrick, 40 Miss. 374 (1866); 22 Am.Jur.2d Damages § 85 (1965). [223 So.2d at 302, 303].
In Swaggart v. Haney, 363 So.2d 251 (Miss. 1978), Haney sustained chemical burns over his body, fracture of the pelvis bone, puncture of his bladder, bruises, and cuts under his eyes. He was hospitalized for seventeen (17) days and incurred medical expenses of $4,422.07. The jury verdict was $100,000, and we said:

*672 Although the $100,000 jury verdict might possibly be higher than another jury would render, we cannot say that it was so high as to evince bias or prejudice, or that it was completely against the overwhelming weight of the evidence. [363 So.2d at 254].
In James Reeves, Contractor, Inc. v. Chain, 343 So.2d 1229 (Miss. 1977), the verdict was $150,000 for back injuries and phlebitis, and a remittitur of $50,000 was entered. The Court said:
The test for determining whether a verdict is grossly excessive is whether it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience. Some of our cases have made the statement that the test is whether the jury responded to reason or whether the evidence justified the amount of the verdict. [343 So.2d at 1232].
Some additional cases where substantial verdicts have been affirmed are: Deas v. Andrews, 411 So.2d 1286 (Miss. 1982) [$202,000 for loss of leg]; Daniels v. Soder, 253 So.2d 849 (Miss. 1971) [$23,141.40 for fracture of leg]; Fruit v. Schreiener, 502 P.2d 133 (Alaska 1972); [$635,000 for loss of one leg]; Rediker v. Chicago, R.I. & P.R. Co., 1 Kan. App.2d 581, 571 P.2d 70 (1977) [$450,000 for loss of one leg]; Gordon v. General Motors Corp., 323 So.2d 496 (La. App. 1975) [$467,000 for fracture to leg]; Barlage v. The Place, Inc., 277 N.W.2d 193 (Minn. 1979) [$700,000 for loss of one leg]; and Lamke v. Louden, 269 N.W.2d 53 (Minn. 1978) [$450,000 for loss of both legs].
As was said in Kinnard v. Martin, supra, each suit for personal injury must be decided by the facts of the particular case. We are of the opinion that the verdict here is not so grossly excessive as to evince passion, bias and prejudice on the part of the jury so as to shock the conscience. Therefore, the judgment of the lower court as to damages is affirmed.
AFFIRMED AS TO DAMAGES.
PATTERSON, C.J., BROOM, BOWLING, HAWKINS and DAN M. LEE, JJ., concur.
SMITH and SUGG, P.JJ., and WALKER, J., dissent.
HAWKINS, Justice, dissenting as to Part III:
I respectfully dissent solely as to the majority's reversing and rendering the judgment against Kyles and his employers.
An opinion already triturated as this can hardly gain from further exposition by a minority expression. My comments, directed solely to the issue of Kyles' negligence, are brief.
The majority opinion fails to note a segment of the testimony of one of the witnesses[1] and an aspect of the physical facts, e.g., the photograph showing the rear end of the United Parcel van, which would justify a supplemental factual hypothesis indicating negligence on the part of Kyles. Yet I am persuaded the factual statement set forth in the majority opinion in and of itself indicates the negligence of Kyles was properly submitted to the jury and the case should be affirmed as to him and his employers also.
On a straight, flat, two-lane highway, with a clear view stretching for at least a mile, Kyles' sausage truck was passed by the United Parcel van driven by the plaintiff Nichols. Ahead of them, partially blocking the opposite lane, was a 38-foot long tractor-trailer loaded with soybeans. Coming from the opposite direction was a Chevrolet Nova being driven by Brooks. All this was in clear view.
At this particular moment, the vehicles were sufficient proximity for Kyles to recognize it was prudent "to let off my accelerator a little bit," and "to slow down a little bit because of the coming situation."
*673 Brooks' Chevrolet Nova pulled over into Nichols' United Parcel van's lane to go around the disabled truck and the two vehicles collided head-on.
The jury found Kyles was neither keeping sufficient lookout ahead nor keeping his vehicle under sufficient control to stop prior to crashing into the first wreck a moment later.
The jury was properly instructed on the duty of Kyles to keep a proper lookout ahead and to keep his vehicle under proper control. On this issue, they manifestly found against Kyles.
The majority opinion has chosen just one (and in my view a far weaker) inference of fact from this case, i.e., that under the circumstances Kyles had no duty to slow down sufficiently or be sufficiently alert to avoid causing the second collision.
I believe the record fully justifies an inference of fact for the jury that Kyles failed to keep a proper lookout ahead and/or failed to keep his vehicle under proper control to avoid this collision, and under manifestly proper instruction found against Kyles and his employers. Strong argument can be made that Kyles should have observed the potential peril of an impending crash, and easily could have slowed sufficiently to avoid the second crash; hence, the jury issue. The jury, in my view at least, was certainly justified in wondering why Kyles, under these circumstances, never once put his foot on the brake prior to the first crash.
This case involves a multiple collision in a spacetime relationship which was peculiarly for the jury, not a court, to decide whether Kyles was keeping his vehicle under proper control and/or keeping a proper lookout ahead. It is the very sort of case in which the jury should decide these two issues. See Dorroh v. Cotten, 259 So.2d 121 (Miss. 1972); Freeland v. Henderson, 252 So.2d 899 (Miss. 1971); and Mooney v. Lawley, 214 So.2d 679 (Miss. 1968).
BOWLING and DAN M. LEE, JJ., join in this dissent.
WALKER, Justice, dissenting as to Part IV, Liability of Woods.
Nichols charged in his declaration that Woods was negligent in leaving his disabled vehicle partially protruding in the traveled portion of the highway for an unreasonable length of time and such negligence proximately contributed to the cause of the accident and resultant injuries and damages suffered by Nichols.
Assuming, arguendo, that Woods was negligent by leaving his disabled rig approximately eighteen inches on the paved portion of the road for an unreasonable length of time under the circumstances, the evidence negates any theory or contention that such negligence was a proximate cause of Nichols' injuries and damages.
It is undisputed that the disabled vehicle was visible to all parties for more than a mile in each direction, and each of the parties testified that as they approached the disabled vehicle, they were aware of it.
Plaintiff Nichols' relevant testimony was as follows:
Q. Now, I believe that you have stated that when you first saw the Nova approaching from the other direction it was about a mile away. Is that correct?
A. Yes, sir.
Q. All right now, was there any traffic on the road in front of you going northbound or in front of him going southbound that was between the two cars?
A. No, sir.
Q. So the fact is there was no traffic in the road between  no moving vehicles in the road between the front of your van and the front of his Nova.
A. No, sir.
Q. This is a long, flat area, I believe you have testified.
A. Yes, sir.
Q. And there are no obstructions whatever to visibility of anything parked along the side of the road in there, is there?
A. I don't believe.

*674 Q. And you could see the disabled truck on the morning of the accident from at least a half a mile away, I believe you said.
A. Yes, sir, something like that.
Q. On the day before when you went to Yazoo City and back, you had seen the truck or you remember seeing the truck, as I understand you, when you were coming back, anyhow.
A. Yes, sir.
Q. And as you came back from Yazoo City toward Jackson, the truck was off on the shoulder of the road on your right. Is that correct?
A. Yes, sir.
... .
Q. And in passing by it in your van, you were able to stay completely in the southbound lane of traffic, could you not?
A. Yes, sir.
Q. And so you know that a Nova Chevrolet is smaller than a UPS van, don't you?
A. Yes, sir.
Q. And if the UPS van could pass by without getting over the yellow line or over the middle line, there is no doubt in your mind that a Nova Chevrolet could do it, is there?
A. I would think so, yes, sir.
... .
Q. All right. When did you first observe a car approaching from the north?
A. After I had completed my pass around the grain [sic  sausage] truck.
Q. All right now, where was that car with respect to the center of the highway when you first observed it?
A. He was on his side of the road.
Q. All right. What, if anything, was that car doing that appeared unusual or that called your attention to it in any special way?
A. Nothing.
Q. All right. And as you were approaching the grain truck, at what speed were you traveling?
A. Around fifty, between fifty and fifty-five.
Q. All right. Now, what, if anything, did you do as you came nearer to the grain truck?
A. I let off my accelerator a little bit.
Q. And why did you do this?
A. To slow down a little bit because of the coming situation. The grain truck was out a little bit.
Q. All right now, at that time, had the oncoming vehicle done anything unusual.
A. No, sir.
Q. All right. Then tell the jury if you will, Ron, what next occurred.
A. Well, just all of a sudden the Nova just came over in my lane, and I slammed on brakes and tried to turn to the right, and that's all I remember. (emphasis added).
Q. All right. And when the Nova  and this is the vehicle driven by Larry Brooks?
A. Yes, sir.
Q. All right. When it came over in your lane, how did it come over there?
A. Quickly, suddenly. Just all of a sudden he just zipped over.
Q. All right. And you did what?
A. I just slammed on brakes and tried to turn to the right to get out of his way.
Q. All right now, at the time he came over in your lane, do you know where you were with respect to the disabled trailer on the shoulder of the road?
A. I imagine I was about seventy-five feet this side, south side of the trailer.
Q. You had not gotten to the trailer?
A. No, sir.
Q. Had he gotten to the trailer?
A. No, sir.
Q. Could you estimate how far north of the trailer he was when he zipped over in your lane, as you call it?
A. Probably around a hundred feet. DEFENDANT BROOKS, DRIVER OF THE NOVA, TESTIFIED AS FOLLOWS:
Q. How far away was this truck-trailer when you first saw it?
A. Between a quarter of a mile to a half mile from the curve in the Big Black River bridge.

*675 Q. Quarter of a mile and a half mile?
A. Yes.
Q. Let's look at your deposition again, on page 21. See if you recognize your answer.
A. Where do you want me to read?
Q. This would be down near line 21 and 22.
A. Your question?
Q. How far away was the truck-trailer when you first saw it?
A. When I gave this deposition, I was under the impression it was a mile away.
... .
Q. O.K. Mr. Brooks, go ahead. I want to find out exactly how this wreck happened.
A. And as I was approaching the eighteen-wheeler, I moved over slightly to my left to insure that the righthand passenger side on which my aunt was driving would not go into the eighteen-wheeler, which was sticking in our line. And at the same time the eighteen-wheeler was situated near a big, ole gully. Just in case something strange happened, I didn't want to be on that side of the gully. So at the same time it was two objects coming toward us. O.K. It appeared that one of the objects was passing the other object. And as we were approaching the eighteen-wheeler, I was approaching the eighteen-wheeler, and the markings were saying  I don't know whether they were flashing or whether they were little triangles, but I knew that the eighteen-wheeler was not moving, and I clicked on my blinkers or flashed my headlights on and off like you're driving at night and someone is passing and they're coming at you and you flash the light on to say you're there, slow down, back it up, get back in, because there's originally not enough chance, me going at my speed and you going at your speed, so we can both get through that square. And as I put my blinkers on, instinct or something told me to move a little bit closer and see what was going on. And as I moved to see what was going on, I said, "What the hell?" And when I said "hell", I woke up in the hospital.
Q. So that's the last thing you remember?
A. That's the last thing I remember, with the exception of, as I said, this silver streak, I said in the deposition given in October, came across my right hand. I don't know what this silver streak was.
Q. When you were last conscious, you were approaching then the grain truck and you were moving to the left.
A. No, I was not moving to the left. I was at the position at which I was reasonably safe. I was no longer moving. (Emphasis added).
Q. Well, where were you?
A. I was going straight ahead.
Q. In whose lane?
A. My lane.
DEFENDANT KYLES, DRIVER OF THE SAUSAGE TRUCK, TESTIFIED AS FOLLOWS:
Q. But you could see the disabled van on the shoulder?
A. The disabled tractor-trailer, yes, sir.
Q. All right. Now, Mr. Kyles, can you explain to the jury why, in light of approaching a disabled van on the shoulder of the road on a two-lane highway, that you did not reduce your fifty-five mile per hour speed as you were approaching that disabled trailer?
A. Sir, the front end of his  he was clear of the highway. And I didn't see nobody around out there trying to stop nobody. I didn't see no reason for me to slow down or try to do anything than go on and try to make my deliveries and make it back.
... .
Q. That's right. After the accident, you walked right down the lane there right by the truck itself and observed how much room there was in the southbound lane, did you not?
A. Yes, sir.
Q. And there was plenty of room, was there not, for a vehicle to pass by the truck in the southbound lane without ever getting across the center line?

*676 A. Yes, sir.
From the above testimony, I am of the opinion that the only reasonable conclusion is that the disabled rig was not a proximate contributing cause of the accident. Not a single party to the accident testified that the parked, disabled trailer rig played any part in the cause of the collision of the vehicles. The trial court should have sustained defendant Woods' motion for a judgment notwithstanding the verdict.
I strongly disagree and dissent from the holding of the majority which imposes liability upon Woods and am at a loss to understand their reasoning. I have the deepest sympathy for Nichols who was seriously and permanently injured, but it is unjust and unfair to impose his loss and damages upon Woods when the negligence of Brooks was the sole proximate cause of this tragic collision.
PATTERSON, C.J., SMITH, P.J., and BROOM, J., join this dissent.
WALKER, Justice, dissenting as to Part V, Damages.
I respectfully dissent from the holding of the majority in affirming the damage award of $550,000.00.
The question presented is whether the jury verdict of $550,000.00 is so grossly excessive as to evince bias, passion and prejudice on the part of the jury.
Some of the elements that may be considered by the jury in fixing the amount of damages suffered by a plaintiff include: the degree of physical injury, mental and physical pain, present and future, temporary and permanent disability, medical expenses, loss of wages and wage-earning capacity, sex, age and plaintiff's state of health. Mobile & Ohio Railroad Co. v. Carpenter, 104 Miss. 706, 61 So. 693 (1913); Kinnard v. Martin, 223 So.2d 300 (Miss. 1969); the loss of use of limbs, Memphis & C.R.R. Company v. Whitfield, 44 Miss. 466 (1870); Grenada Dam Contractors v. Patterson, 48 So.2d 480 (1950); disfigurement or mutilation of the body, Vascoe v. Ford, 212 Miss. 370, 54 So.2d 541 (1951); Rankin County v. Wallace, 230 Miss. 413, 92 So.2d 661 (1957); Jenkins v. Cogan, 238 Miss. 543, 119 So.2d 363 (1960). With regard to the impact of inflation and change in the purchasing power of money and cost of living, see Kinnard v. Martin, 223 So.2d 300 (Miss. 1969) and Shaw v. Richardson, 392 So.2d 213 (Miss. 1980).
A few cases of interest involving sizable verdicts are: Dendy v. City of Pascagoula, 193 So.2d 559 (Miss. 1967) in which this Court affirmed a remittitur of $450,000 on a $550,000 verdict. The plaintiff in that case was permanently paralyzed as a result of diving from a city pier. Also involved in the case was Dendy's contributory negligence.
Capital Transport Company v. Segrest, 254 Miss. 168, 181 So.2d 111 (1965) in which this Court affirmed a remittitur of $20,000 on a $90,000 verdict. The plaintiff Segrest, who owned and operated a service station, suffered third and second degree burns as the result of an explosion which occurred while a Capital Transport truck was unloading gasoline at the station.
James Reeves, Contractor, Inc. v. Chain, 343 So.2d 1229 (Miss. 1977) involved a remittitur of $50,000 on a $150,000 verdict. The injuries complained of in that case involved a motor vehicle accident where the plaintiff, the mother of three children, suffered back injuries and phlebitis requiring sixty days hospitalization.
M.F.C. Services v. Lott, 323 So.2d 81 (Miss. 1975) wherein this Court affirmed a remittitur of $100,000 from a judgment of $175,000 where plaintiff's injuries consisted of severe back and neck injuries that prevented him from operating his trucking operation and cattle business.
Kinnard v. Martin, supra, held that the jury had great discretion in fixing awards but qualified it by saying, "However, the discretion vested in the jury is not an arbitrary discretion. It must be exercised reasonably and intelligently to the end that the plaintiff may recover reasonable compensation for the loss he has sustained. 25 C.J.S. Damages § 81 (1966). Each suit for personal *677 injury must be decided by the facts shown in that particular case... ." (323 So.2d at 303).
In James Reeves, Contractor, Inc. v. Chain, supra, this Court said: "The test for determining whether a verdict is grossly excessive is whether it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience. Some of our cases have made the statement that the test is whether the jury responded to reason or whether the evidence justified the amount of the verdict." (343 So.2d at 1232).
The evidence reveals that the plaintiff Nichols suffered severe permanent disabling and painful injuries, suffered medical expenses in the amount of $25,914.91, loss of wages in the amount of $25,760.00, loss of future wage-earning capacity resulting in loss of future earnings of $14,739.00[1] and future medical expenses of approximately $6,982.00.[2] These losses amount to a total of approximately $73,395.91. This sum would compensate Nichols for his monetary losses.
The next question is whether the remaining amount of the verdict, i.e., $476,604.09 ($550,000.00 less $73,395.91) is so great as to evince bias, passion and prejudice or that the award is so great as to shock the conscience with respect to compensating Nichols for mental anguish, disfigurement (including the loss of his right leg from approximately four to six inches above the knee), and pain and suffering, past, present and future.
The statement of the Court in Capital Transport, supra, is applicable to this case:
The plaintiff's injuries in this case are indeed severe, and he is unquestionably entitled to substantial damages. The court is sure that this plaintiff or any person, would not elect to undergo the ordeal of pain and suffering and injury encountered here for any sum of money, but yet the amount to be awarded must meet the test of such modern economic standards as have been accepted, approved and developed in this jurisdiction... . It is the opinion of the court that the largeness of the verdict was prompted by an overwhelming sympathy (perhaps understandably so) on the part of the jury, but that the elements of passion and prejudice permeate the verdict to the extent of making it legally excessive. (254 Miss. at 183, 181 So.2d at 117-118).
I have carefully considered Nichols' elements of damages along with the rules with respect to determining damages heretofore mentioned and am of the opinion that the award of $550,000.00 was excessive by $250,000.00 and that a remittitur should be ordered, leaving a judgment in the amount of $300,000.00.
SMITH and SUGG, P.JJ., join this dissent.
NOTES
[1] William C. Boteler is now deceased and this cause was revived in the name of Willie Hazel Boteler, Executrix of the Will and Estate of William C. Boteler on July 22, 1980.
[2] Russell D. Corey is now deceased and this cause was revived in the name of Alfred E. Corey, Executor of the Estate of Russell D. Corey on February 19, 1980.
[3] Mrs. Anderson agrees that if an agency relationship is found to exist between Mrs. Anderson and Mrs. Johnson, that the sub-agency of Brooks would also exist.
[4] On his deposition, Brooks said that he was one mile away when he first saw the truck-trailer.
[5] Had the judgment been larger, the Appeals Court may have affirmed it.
[1] The majority opinion quotes certain parts of the testimony of Larry T. Brooks, driver of the Nova automobile. The principal testimony of Brooks regarding the two trucks coming toward him was that the last time he saw them they appeared to be side by side, and one appeared to be trying to pass the other. In my opinion, this ignored testimony of Brooks clearly authorized that the liability of Kyles be submitted to the jury.
[1] Present value of loss of $1,680 per year for 45 years  the life expectancy of Nichols.
[2] This amount is present value of payments every 3.5 years of $2,400 for Nichols' life expectancy.