411 So.2d 1286 (1982)
George W. DEAS, d/b/a Deas Tire Company
v.
Willie Edward ANDREWS.
No. 53108.
Supreme Court of Mississippi.
March 31, 1982.
Rehearing Denied April 21, 1982.
On Motion May 26, 1982.
*1287 White & Morse, Stanford E. Morse, Jr., Gulfport, for appellant.
Holleman & Krogstad, Boyce Holleman, Jim W. Rose, Gulfport (Blackwell, Owen & Galloway, Ben T. Galloway, Gulfport, On Motion Under Rule 19 to Correct Judgment), for appellee.
Before SMITH, ROY NOBLE LEE and BOWLING, JJ.
On Motion Under Rule 19 to Correct Judgment May 26, 1982.
SMITH, Presiding Justice, for the Court:
Willie E. Andrews brought suit in the Circuit Court of Harrison County against George W. Deas, d/b/a Deas Tire Company, demanding damages for personal injuries alleged to have been sustained when he was backed into by Deas' truck. Following a trial, the jury returned a verdict for Andrews against Deas in the sum of $202,000. From the judgment entered pursuant thereto, Deas has prosecuted this appeal.
Andrews was a truck driver, operating eighteen wheeler tractor-trailer trucks for his employer, Gulf Coast Pre-Stress Company, earning $13,750.00 per year. Deas was under contract with Gulf Coast Pre-Stress to service the tires on its several vehicles. On November 11, 1977, Deas' service truck was upon the premises of Gulf Coast Pre-Stress in the course of providing this service under the contract. Andrews' boss, who was standing somewhere behind the Deas' truck, called to Andrews and Andrews walked over to him. At this time, the Deas truck, without warning, began backing and its corrugated steel bumper struck Andrews in the back of his leg beneath his left knee (on the upper part of his calf), causing Andrews' leg to buckle and him to "sit down" on or against the rear part of the backing truck in such a manner that the bumper struck the back of Andrews' left leg above the knee (on the lower part of his thigh).
On the date of the above occurrence, Andrews was fifty-seven years old and suffered from diabetes for which he was under treatment by diet and medication. There was also testimony that prior to the injuries sustained when he was hit by the Deas' truck, Andrews also suffered "moderate to severe" atherosclerosis in both legs, and diseased arterioles, a condition which was related to Andrews' habit of heavy smoking and to his diabetic condition. Andrews testified that following his injury, although he experienced considerable pain (which he compared to "a fire" going through his leg), he did not immediately consult a doctor. During this period his wife provided conservative treatment with ointment and massage, and he continued to work, making a number of trips for his employer. From November 11 to December 30, Andrews' condition continued to worsen. He developed a limp in his left leg and there was testimony that his left foot became cold to the touch. It appears that between the happening of the incident in which Andrews was injured and his first consultation with his doctor, on December 30 Andrews, although he suffered pain and some disability, did not consider that his injury portended serious consequences. But Andrews' condition reached a point where he found it necessary to consult his family physician, Doctor Barkley, a Gulf Coast surgeon, and he did so on December 30. Andrews' examination by Doctor Barkley revealed a "cold" left foot and reduced pulse in Andrews' lower leg and suggested to the doctor that Andrews should return for further examination and tests by his associate, Doctor Sproles. When Doctor Sproles examined Andrews on January 4 it was apparent that, while Andrews' right foot had good blood flow, there was an occlusion in the superficial femoral artery in his left leg, with a pulse so low that Doctor Sproles and Doctor Barkley considered that immediate surgery was required to restore blood flow to Andrews' *1288 left foot and the distal portion of his left leg.
On January 15 Doctors Sproles and Barkley operated on Andrews' left leg. Incisions were made in the femoral artery in the groin area and in the popliteal artery just below the kneefold, connecting the ends with a dacron tube which bypassed the occlusion. However, the bypass proved ineffective and blood was not reaching the left foot and lower left leg, so that, in the opinion of the doctors, gangrene impended. Increased and more severe pain was now suffered by Andrews requiring large doses of pain reliever. The graft itself occluded and pain had become worse and unremitting and Andrews requested that his left leg be amputated. In the opinion of the surgeons at this point it was impossible to save the left leg because gangrene was imminent and would threaten Andrews' life. On February 4 Andrews left leg was amputated. Following the removal of Andrews' leg, he remained in the hospital for a month. He continued to see Doctor Sproles after leaving the hospital. He continued to treat the healing stump and eventually prescribed a "suction socket" artificial leg. This was fitted but gave Andrews considerable discomfort. There is testimony about Andrews' difficulty in this area in learning to use the artificial leg and coping with the phantom pains from the nonexistent foot and leg.
Notwithstanding all of the above, during his recuperation Andrews declared that he would be able to return to driving large trucks and that he would do so as soon as he could operate his artificial leg properly. This, however, proved impossible.
Andrews' case was made out by his own testimony and that of his wife, and by the testimony of Doctors Sproles and Barkley. The circumstances relating to Andrews' injury by the backing truck was established by Andrews' testimony and that of Bill Brown and Mel Cooper. Andrews and his wife testified as to the progression of the injury and Doctors Sproles and Barkley as to the cause and medical aspects of the femoral artery occlusion.
There seems to be no real dispute as to the manner in which Andrews was injured. The real issue in the case relates to whether the trauma which resulted when the Deas' truck had been backed into him caused or contributed to the occlusion of the femoral artery in Andrews' left leg and consequent loss of his leg, or whether, as contended by Deas, the occlusion and its consequences resulted solely in Andrews' existing diabetic condition and the condition of his arteries at the time. This issue was addressed by the testimony of eight medical experts, four testifying on each side.
No question is raised on appeal as to the qualifications of any of the expert medical witnesses.
Andrews offered the testimony of Doctors Sproles and Barkley. Andrews had been under Doctor Barkley's care on several occasions in 1976-1977, including treatment and surgery in connection with a perianal abscess and gallbladder. On December 30, 1977 (following the incident with the Deas' truck on November 11, 1977), when Andrews saw Doctor Barkley, he was complaining of nausea and pains in the calf of his left leg. Andrews gave a history as having been hit by a truck some three months before. Doctor Barkley could discover no pulse in the left foot and ankle and asked Doctor Sproles to perform a doplar examination to determine the flow of blood in the left leg. Doctor Sproles placed Andrews in the hospital and performed some angiograms (x-rays made with a contrasting dye injected into the aorta). These disclosed an occlusion in the superficial femoral artery in the left leg which completely cut off the blood flow into that artery. He found that because of this occlusion, the collaterals or smaller arteries, through which some blood will flow when a large artery becomes blocked, had been brought into use but that very little blood was reaching the lower leg and foot, not enough in his opinion, to keep the leg and foot alive. It was Doctor Barkley's opinion that the occlusion was the result of the trauma incurred by Andrews when he had been hit by the Deas' truck. An operation was indicated *1289 and performed for the purpose of inserting a bypass of the occlusion in order to permit blood to reach the leg and foot.
The bypass was surgically implanted but failed to provide a sufficient amount of blood to reach the lower portions of the leg and foot. The tissues of the foot began to "die" and the leg began to take on a bluish color. Doctor Barkley stated that resulting pain was extreme and unremitting and that in order to prevent gangrene it became necessary to remove Andrews' left leg. Doctor Barkley described Andrews' condition as due to a traumatic occlusion which had resulted from a blow to his leg and stated that this view was supported by the fact that symptoms had begun to manifest themselves almost immediately after the incident with the Deas' truck.
Doctor Sproles, who made the doplar examination of Andrews, reviewed Andrews' symptoms and complaints and said that occlusion of the femoral artery of the left lower leg was indicated. He testified that reconstruction of the artery was necessary, describing the surgical procedure. He described the operation and the implantation of the bypass, but stated that the operation was not successful because the dacron tube implanted for the purpose of bypassing the occlusion became clotted and the leg showed signs of impending gangrene. He testified regarding the necessity for the amputation of Andrews' leg and the difficulties and procedures which followed. Finally, Doctor Sproles stated that it was his opinion that the occlusion of the artery was caused by the blow of the truck on Andrews' leg which had brought about the acute condition. Doctor Sproles supplemented his testimony by stating that on the day before the trial he had examined Andrews' right leg and found that he was having no problems with it and blood pressure in the right leg was good, the color was good, and that there was no significant obstruction of blood flow in the right leg. It was his opinion that this supported his view that Andrews' traumatic injury had brought about the occlusion which had resulted in the loss of his left leg and that the occlusion and consequent loss of the leg had not been due to Andrews' chronic condition.
Deas countered by offering the testimony of four doctors, Doctor Justice, an internist; Doctor Haygood, a vascular surgeon; Doctor Wilcox, whose field was cardiopulmonary vascular disease and Doctor Rosenblatt, an internist and cardiologist.
In response to hypothetical questions, each of these doctors testified that, in his opinion, "the trauma did not cause or contribute to the thrombosis of the left superficial artery." Each doctor gave it as his opinion that atherosclerosis had brought about the necessity for the amputation of Andrews' leg. It was their view that the trauma had neither caused nor contributed to the necessity for the amputation, saying the fact that, after sustaining the traumatic injury, Andrews continued to work and to drive trucks for forty-seven days; it being each doctor's opinion that, if the traumatic injury had been severe enough to cause the occlusion, the attendant pain would have made this activity by Andrews impossible.
Although Doctor Justice testified that the accident did not contribute to the occlusion on direct examination, he conceded on cross-examination that trauma could cause an occlusion in a diseased artery but not, in his opinion, in the location at which the occlusion had occurred in Andrews' leg. It was his opinion that the occlusion in Andrews' leg was not an acute one.
Doctor Rosenblatt, an internist and cardiologist, in response to a hypothetical question, said that it was his opinion that there was no causal connection between the trauma and the occlusion of the left femoral artery. Doctor Rosenblatt emphasized Andrews' condition as a diabetic, overweight, heavy smoker with a history of high blood pressure and said that in his opinion all of this taken together with advanced atherosclerosis placed Andrews in a category where the occlusion would have occurred in any event. He agreed with Doctor Justice that if the trauma had caused the occlusion Andrews would not have been able to function for the next few weeks in connection with his job because the attendant pain would have been intolerable.
*1290 Doctor Haygood, answering a hypothetical question said that, after reviewing the records, angiograms and listening to the statements contained in the hypothetical question propounded to him it was his opinion that the "injury caused by the truck did not have anything to do with the occlusion of the vessel." It was his opinion that the occlusion was a consequence of Andrews' atherosclerosis and heavy smoking. Doctor Haygood's testimony approximated that of Doctors Rosenblatt and Justice, who had preceded him.
Doctor Wilcox, basing his opinion upon facts stated in a hypothetical question addressed to him and upon records which were shown him, said his opinion was that, because of the degree of atherosclerosis present in Andrews' blood vessels and particularly because of the stage that this disease had reached in Andrews' left iliac artery and the superficial femoral artery, this condition had brought about and had been the cause of the occlusion. It was his belief that the trauma appeared to have been minor and probably did not contribute to the occlusion. Doctor Wilcox went further and said that his studies of the records had convinced him that the disease or lack of circulation had not resulted from any trauma Andrews had received on November 11, but from a chronic occlusion, an ailment common in the fifty year age group. He added that Andrews' excessive smoking, hypertension and diabetes were significant factors in the formation of the occlusion although the diabetes seemed to have been under reasonably good control.
In rebuttal Andrews called two other doctors, Doctor Thomas L. Graves, an internist, and Lt. Col. Richard Toon, a surgeon. Neither of these doctors had treated Andrews. In response to a hypothetical question propounded to Doctor Graves by Andrews' counsel, Doctor Graves stated that in his opinion the impact of the truck upon Andrews' left leg had greatly contributed to the occlusion and subsequent loss of the leg. He said that only a minor trauma is necessary to bring about the occlusion where atherosclerosis is present. He explained that upon the interior lining of the blood vessels in cases of atherosclerosis, plaques form which can tear during trauma allowing atherosclerotic occlusion to form. He said that a few days or weeks after trauma has brought about this condition, it chronically progresses and the occlusion worsens, causing claudication, and finally rest pain, which signifies a hundred percent occlusion of the artery. It was his opinion that Andrews' case was one which involved such a situation, saying, that had it been acute, Andrews would have exhibited more symptoms initially. He testified that the trauma was the stimulus or cause of an intimal tear which ultimately resulted in a total occlusion of the femoral artery.
Doctor Toon, also testifying in response to a hypothetical question and basing his opinion on the facts stated in the question and upon the records submitted to him, was of the opinion that the trauma to Andrews' leg was the probable cause of the occlusion of the left superficial artery. In other respects Doctor Toon's testimony tended to support the views of Doctor Wilcox.
On appeal Deas has assigned several grounds for reversal.
Deas' first contention is that the trial court committed prejudicial error in allowing Andrews to call in rebuttal two doctors, who had not treated Andrews, and who were permitted to give their expert opinions, based upon a hypothetical question and medical records in evidence which were submitted to them.
The expert medical testimony offered by Andrews upon presentation of his case in chief consisted of the testimony of Doctors Sproles and Barkley, both of whom had treated Andrews from the beginning and who had continued to be his doctors throughout the surgery and afterward.
As opposed to the evidence given by these two doctors, Deas offered the expert testimony of four doctors, none of whom had treated Andrews and who are referred to in the briefs as "non-treating doctors." The opinions of each of these four doctors as to the cause of the occlusion and consequent loss of his left leg by Andrews was in direct *1291 contradiction of the conclusions on those subjects which had been given by Doctors Barkley and Sproles.
When the defense had rested and closed, Andrews called in rebuttal to this expert testimony of the four "non-treating" doctors which had been submitted by Deas, two "non-treating" doctors. These doctors, basing their opinions upon facts stated in a hypothetical question and records in evidence, drew from these facts and such records a conclusion which contradicted the expert evidence given by Deas four "non-treating" doctors. It is argued by Deas on appeal that permitting these two "non-treating" doctors to be called in rebuttal by Andrews, rather than as part of his case in chief, was error and that he was prejudiced thereby. In Winterton v. Illinois Central Railroad Co., 73 Miss. 831, 20 So. 157 (1896), this Court stated the rule:
The order of judicial investigation, including the time and manner of introducing evidence, is, and of necessity must be, committed to the sound discretion of the trial judge; and appellate courts should not interfere to reverse the exercise of this discretion by a trial court unless such exercise appears to have been had arbitrarily, capriciously, or unjustly. Was the exercise of the discretion in this case arbitrary or unjust? (Emphasis added). (73 Miss. at 836, 20 So. at 158).
While Winterton is an old case it does not seem to have been overruled and the rule thus stated still appears to be sound. There is no indication in the record that the introduction by Andrews of the expert testimony of two "non-treating" doctors in rebuttal, under the circumstances of the case, rather than as part of his case in chief, was prejudicial or requires reversal. Nor do we think the trial judge in permitting it acted arbitrarily or improperly or abused his judicial discretion. We are not persuaded that the order of the introduction of this evidence resulted in such prejudice to Deas as to require reversal and find no merit in this assignment.
Deas next assigns as grounds for reversal that he was denied the right to offer evidence in surrebuttal.
It appears that Deas wished to "reserve" Doctor Wilcox to testify as a witness in surrebuttal. The trial court declined to permit this and Doctor Wilcox, with the three other doctors who testified for Deas, testified on the presentation of the defendant's case in chief. It is argued by appellant that permitting Andrews to "hold back" two "non-treating" doctors for rebuttal was unfair, particularly Deas argues, since Deas had not been permitted to reserve the testimony of Doctor Wilcox for surrebuttal. Dr. Wilcox's testimony was duly given at length on presentation of the defense in chief and was heard by the jury. After Doctor Graves and Lt. Col. Toon testified, Deas did not enter into the record the particular testimony of either Doctors Graves or Toon which it desired to rebut by using Doctor Wilcox on surrebuttal. All of the testimony by the "non-treating" doctors, both for plaintiff Andrews and defendant Deas consisted of the expression of expert opinions arrived at upon facts stated in hypothetical questions and in evidence and the opinion entertained by the witness based thereon. All of this testimony went to the jury notwithstanding that complaint was made in the trial court by Deas in not being permitted to reserve Doctor Wilcox for surrebuttal. It has not been demonstrated that the order in which this testimony was given prejudiced the defense. If it was desired to rebut on surrebuttal any new fact or facet of the testimony of the two "non-treating" doctors who testified on rebuttal for Andrews, Doctor Wilcox might have been recalled for that specific purpose on surrebuttal. This was not done. We are unable to say that the trial judge abused his discretion in his rulings in connection with these matters or that prejudice to Deas resulted therefrom.
The third assignment for reversal is to the effect that the trial court erred in refusing to grant defendant's "proximate cause" instruction.
Defendant's instruction No. 2, which the trial court declined to grant was as follows:

*1292 The court instructs the jury that the "proximate cause" of an injury is that cause, which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the results would not have occurred.
Defendant's instruction No. 3, which the court declined to grant was as follows:
The court instructs the jury that in order to be a proximate cause, the negligence of the defendant must be a substantial factor in producing plaintiff's injury. If the plaintiff would have been injured even if the defendant had not been negligent, the defendant's negligence is not a substantial factor and not a proximate cause.
Andrews argues that the use in defendant's instruction No. 2 "unbroken by any efficient intervening cause," would be misleading to the jury which might be caused to assume that there was a dispute as to the cause of the accident. It is suggested by appellee that an instruction to the jury that if it should find that Andrews' misfortune with respect to the leg and its consequent loss were due not to the traumatic injury but solely to a preexisting condition or disease, such an instruction might have been proper and, in fact, Deas' instruction No. 4 covers that contingency. There appears to be no dispute that the traumatic injury to Andrews resulted from the negligent operation of Deas' employee of the Deas' truck in striking Andrews. We agree that defendant's instruction No. 2 might be proper in cases in which it might be applied to facts in evidence. It was improper in this case in providing that the jury might find for the defendant if they found that Andrews' injury was caused by "any efficient intervening cause," which produced the injury, "without which the results would not have occurred."
Defendant's instruction No. 3 is clearly not applicable to the facts in this case. There is no testimony that Andrews sustained any injury except that received when he was run into by the Deas' truck. Andrews' physical condition at the time of his injury was not "an efficient intervening cause." There is no dispute that Andrews' traumatic injury was the result of negligence on the part of Deas' employee, acting in the course of his employment.
Both defendant's instructions 2 and 3 are abstract in nature and are not predicated upon facts in evidence, although the instructions are said to have been taken from Mississippi Model Jury Instructions they were not made applicable to the facts and circumstances in the instant case.
The trial court granted defendant's instruction No. 4 as follows:
If you find from a preponderance of the evidence in this case that plaintiff's injury was due directly and exclusively to natural causes, without human intervention and which could not have been prevented by the exercise of reasonable care and foresight, the occurrence is due to a pre-existing condition for which the defendant is not liable.
Also granted was jury instruction No. P-6 which was as follows:
If your verdict is for the plaintiff, then the court instructs you that even though you find that he had pre-existing atherosclerosis in his left superficial femoral artery at the time the defendant's truck struck his left leg, if you further find by a preponderance of the evidence that the impact of the truck aggravated or made worse this pre-existing condition and either directly caused or contributed to the occlusion or blockage of that artery leading to the amputation of his left leg, then you must award the plaintiff a reasonable sum for all damages, if any, he has proven by a preponderance of the evidence to have suffered and will suffer as a result of that amputation.
Appellee points out that the above instructions clearly and correctly covered the circumstances in evidence in this case and that in negligently injuring Andrews that appellant "took him as he found him" and is responsible for all injuries which ensued in an unbroken sequence. See Tri-State Transit Co. v. Martin, 181 Miss. 388, 179 So. 349 (1938).
The fourth proposition argued by Deas is that the trial court erred in declining to grant his requested instruction No. 6. Instruction No. 6 was as follows:
The court instructs the jury that in computing the plaintiff's damages, if any, proximately caused by the defendant's negligence, if any, you are not to compensate the plaintiff for pre-existing physical *1293 conditions, that is physical conditions which the plaintiff suffered from prior to the accident, unless the pre-existing physical condition was aggravated as a proximate result of the defendant's negligence, if any. Even if you find that the plaintiff suffered from a pre-existing physical condition which was aggravated as a proximate result of the defendant's negligence, if any, you should not compensate the plaintiff for damages that would have existed from his previous condition without the aggravation; and where a pre-existing physical condition is bound to worsen, an appropriate discount should be made for the damages that would have been suffered even in the absence of the defendant's negligence, if any.
There appears to be no question that the backing of the Deas' truck into Andrews, which proximately caused the traumatic injury to Andrews' left leg, was negligent. Instruction No. 6, however, appears to leave open the question referring to defendant's "negligence, if any," and in referring to Andrews' damages, also qualifies that aspect of the case by saying "if any". The instruction proceeds in its latter part to relate to "damages" that "would have existed" without the traumatic injury which occurred when Andrews was hit by the backing truck, as to which the jury is left to speculation and conjecture. The instruction contains no guide for distinguishing or apportioning "damages that would have existed from his previous condition without the aggravation," nor is there an evidential basis for measuring the extent that Andrews' preexisting condition "is bound to worsen". The instruction affords the jury no guide in applying such an assumption. Nor is there any guide furnished the jury as to what would be an "appropriate discount" for "damages that would have been suffered even in the absence of defendant's negligence, if any."
Deas defends the instruction saying that "... most doctors who testified recognized that it was possible for him to have suffered an occlusion and lost one of his legs without trauma." (Emphasis added).
There is no evidence that the occlusion or thrombosis in Andrews' left leg was improperly treated or that it and the loss of Andrews' leg were the result of malpractice or negligence on the part of Andrews' doctors.
In Garrett v. Wade, 259 So.2d 476 (Miss. 1972), it is stated:
This Court has consistently held that medical testimony is not probative unless it is in the terms of probabilities and not possibilities. In Scott County Co-Operative v. Brown, 187 So.2d 321 (Miss. 1966), we held that the doctor's statement that he was of the opinion that the mental condition "could have been caused" by the accident was insufficient to justify submitting to the jury the question of causal connection between the malady and the accident... . (259 So.2d at 479).
Instruction No. 4, quoted above, considered with all of the other instructions, correctly and adequately stated the rule applicable to the facts of the case.
We are unable to agree that the trial court committed prejudicial error in declining to grant defendant's instruction No. 6.
Finally, Deas argues that the $202,000 verdict is excessive.
In support of this proposition, Deas points out that Andrews' loss of future wages was $110,000 and his medical expense was $15,211, leaving $76,789 of the verdict which must have been attributed by the jury, it is argued, to pain and suffering. The pain that Andrews has suffered and will suffer was constant and sustained and will continue. The loss of his leg effectively robs Andrews of his vocation and leaves him an incurable cripple, incapable of participating in normal activities and grossly affecting his life in all its aspects. The pain and difficulty occasioned by the necessity of wearing a false leg embraces difficulty in getting about at home, on the street and everywhere, twenty-four hours a day until death. While the verdict is large, we cannot say, on the evidence, that it is excessive, certainly not so grossly excessive as to evince bias, passion or prejudice on the part of the jury in returning it or shock the enlightened conscience. We find no reversible error in the record and the judgment appealed from must be and is affirmed.
AFFIRMED.
*1294 PATTERSON, C.J., SUGG, P.J., and WALKER, BROOM, ROY NOBLE LEE, BOWLING, HAWKINS and DAN M. LEE, JJ., concur.

ON MOTION UNDER RULE 19 TO CORRECT JUDGMENT
On a former day, this Court affirmed the final judgment entered in this case by the Circuit Court of Harrison County and pursuant thereto the mandate of this Court issued thereon.
On April 29, 1982, George W. Deas d/b/a Deas Tire Company, appellant, filed a motion to correct this Court's judgment with respect to the amount of damages assessed upon the said judgment of the circuit court under the provisions of Mississippi Code Annotated section 11-3-23 (1972), as amended by Section 2, Chapter 533, Laws of Mississippi 1980.
This Court, having considered said motion and the response of appellee thereto, finds that the aforesaid judgment of the Circuit Court of Harrison County was entered and filed with the clerk of said circuit court on May 2, 1980.
The Court finds that said amending statute increases the amount of damages to be assessed against an unsuccessful appellant from five percent of the amount of the judgment to fifteen percent and that said judgment of affirmance by this Court assessed fifteen percent of the amount of the judgment unsuccessfully appealed from against appellant.
The effective date of Chapter 533, Laws of 1980 was July 1, 1980 and Section 2 of Chapter 533 provides as follows:
The additional damages provided in Section 1 apply only to judgments and decrees filed with the Clerk of the Court on and after the effective date of this act.
This Court finds and adjudges that, under the said terms of amended statute, the amendment increasing the amount of damages does not, under its terms, apply to the judgment in the present case which was entered and filed with the clerk of said Circuit Court of Harrison County on May 2, 1980.
Accordingly, said motion to correct judgment is sustained and said judgment of this Court is ordered corrected to reflect an assessment of five percent damages, rather than fifteen percent damages, and it is further ordered that the mandate heretofore issued be, and is, withdrawn and that a new mandate issue forthwith reflecting said amendment of said judgment assessing damages at five percent.
SO ORDERED, THIS THE 24th DAY OF MAY, 1982.