451 So.2d 694 (1984)
JESCO, INC.
v.
Robert O. SHANNON.
No. 54060.
Supreme Court of Mississippi.
February 29, 1984.
Rehearing Denied April 25, 1984.
*696 William M. Beasley, W.P. Mitchell, Mitchell, Eskridge, Voge, Clayton & Beasley, Tupelo, Darden, Sumners, Carter & Trout, New Albany, for appellant.
Roy O. Parker, Tupelo, Roscoe B. Hogan, William W. Smith, Birmingham, Ala., for appellee.
Before PATTERSON, C.J., and PRATHER and ROBERTSON, JJ.
PRATHER, Justice, for the Court:
Robert Shannon filed this tort action for recovery of damages for permanent burn injuries sustained by him from an explosion at his place of employment, Sunshine Mills, Inc. in Tupelo. The defendant in the suit was Jesco, Inc., an independent contractor doing maintenance work at the Sunshine Mills plant, including welding. The jury returned a plaintiff's verdict for $1,024,268.00 compensatory damages, from which Jesco, Inc. (hereafter called Jesco) appeals. The plaintiff Shannon cross-appeals on denial of a punitive damage instruction. We affirm on both appeals.
The appellant Jesco assigns as error the trial court's actions in:
(1) Refusing a directed verdict for the defendant Jesco, absent probative evidence that the explosion was caused by Jesco.
(2) Refusing to instruct the jury that they must believe from a preponderance of the evidence that the explosion occurred according to plaintiff's expert witness, or find for the defendant Jesco.
(3) Refusing the defendant's independent intervening cause instruction.
(4) Admitting into evidence an audio-video tape demonstrating burn treatment.
(5) Allowing expert testimony on plaintiff's total loss of future wage earning capacity.
(6) Overruling the defense's objection to its net worth, absent evidence justifying punitive damages.
(7) Refusing a new trial on the excessive award of damages, evidencing the jury's bias, passion and prejudice.
The appellee Shannon's cross appeal charged the trial court erred in refusing to submit the punitive damage issue to the jury.

I.
Robert Shannon is an employee of Sunshine Mills, (hereafter referred to as Sunshine), a manufacturer of dog and fish food.
The Sunshine Mills facility consisted of elevators, a concrete mill building, and a large complex of metal buildings which surrounded the concrete mill building on three sides. The elevators were used for storing raw grain, and conveyors were used to transfer the raw grain to the fourth floor of the concrete mill building. There the raw grain was pulverized by a system of hammermills. Extending from the fourth floor to the first floor were a complex system of some twenty-four bins.
The first story of the mill building contained electrical controls which operated all of the bins, conveyors and other machinery. Also on first floor were the cookers or expanders which cooked the unprocessed raw dogfood.
The cooked material was conveyed to one of four gas-fired open flame dryers. After the material had been dryed, it was returned by conveyor into the mill building where it was processed and stored in storage bins on the upper floors.
*697 Tons of grain, processed and unprocessed dog and fish food, flowed through the complex system continuously.
On the date of the explosion, December 22, 1977, there was in effect an ordinance adopting a fire prevention code by the City of Tupelo governing conditions hazardous to life and property from fire or explosion. This code is the basis of the acts of negligence charged against Jesco that proximately caused or contributed to Shannon's injury.
Sunshine contracted with Jesco to make certain alterations within several bins on the second floor. The work required the cutting into the metal bin with an acetylene torch to build a new spout or chute down to some new equipment. In this area of the second floor there was a cluster of four bins, two containing corn, one containing wheat, and one containing soybean. The bins extended from the fourth floor downward to the second floor where the hoppers were located. Openings at the top of each bin provided an entrance into the bin, and a built-in ladder provided access downward through the bin into the hopper which tapered off to approximately 14 inches square at its bottom.
Jesco's employees, Tommy May and Roger Hawkins, performed the welding on the corn bin and proceeded to the wheat bin.
May viewed the inside of the wheat bin through an inspection plate door and noticed clumps of grain within the bin. Employees of Sunshine were called to clean out the caked-on wheat. Two employees of Sunshine, Talmadge Stubblefield and Johnny Whitehead, crawled down into the bin from the top and scrapped the sides of the bin with a scraper. The wheat was caked on all sides of the hopper. Stubblefield and Whitehead were unable to scrap all of the wheat because some of it could not be reached. They advised the Jesco welders that all of the wheat could not be taken out. The welders, May and Hawkins, told the Sunshine employees that the bin was clean enough so the cleaning was stopped.
Hawkins proceeded to cut the hole. After cutting two sides with an acetylene torch, Hawkins could tell that something was behind the cut. A hole was cut in the center of the cut-out in which a rod was placed to prevent the cut-out from falling into the bin. After five minutes of cutting, the two men were able to lift the entire metal piece out. They saw clumps of smoldering wheat behind the cut metal. May left and returned five minutes later with Stubblefield who attempted to get the remaining chunks of wheat out of the bin.
Satisfied that the bin was cleaned, May welded the chute onto the hopper. Hawkins supposedly watched for fire, but he never looked into the bin after the welding was completed.
May testified that the actual cutting of the metal creates hot slag and BB's, but he could not say whether hot slag and metal BB's penetrated the caked wheat. After the removal of the wheat clumps, neither Hawkins or May saw any fire or smoldering. Droppings from the welding would have fallen onto the floor instead of inside the bin. After welding the hole up, there was no way for May to see any smoke at that point. He stated that he would have been able to smell smoldering wheat through the metal bin had there been any smoke. The time period from the moment the hole was cut until the explosion was estimated to be about forty-five minutes to one hour.
Negligent action was attributed to the Jesco welders in the following respects. No one told May or Hawkins that a fire watch was to be used in the bin for a period of thirty minutes after the welding. Nor did anyone tell them to use non-flammable shields if welding was within thirty-five feet of combustible material. They were told not to cut or weld in a bin that contained flammable solids or anything else that would cause fire. The floor was not wet down around the welding area prior to welding. All of the above are required by the Tupelo Fire Prevention Code.
After the welding, May notified the Sunshine employees that the job was complete. *698 The Sunshine employees restarted the operation, and wheat entered the bin to the point of the welding. May stated that it takes three to five minutes for the weld to cool to the point that it could be touched and the same amount of time for the hot slag from the cutting torch to cool.
May was on the second floor facing north when the explosion occurred. The first thing he remembered was seeing flames come up from the first floor through the manlift openings in the second floor. He did not hear or see an explosion before the fire. He stated that it was pretty noisy since the mill was operating and that he may not have heard a low order explosion if one occurred.
Plaintiff's expert was Emerson Venable, a consulting chemist specializing in materials engineering and safety and health problems. Venable investigated the Sunshine Mill explosion on January 11, 1978, taking pictures and making numerous notes while inspecting the mill premises.
Venable defined smoldering as a nonflaming combustion which can occur with any kind of pourous material that is combustible. He stated that wheat could smolder and that smoldering could go for hours undetected. One may or may not be able to smell smoldering material especially if smoldering is occurring on the inside of a pile. Venable was of the opinion that hot slag, spark, or hot BB's from the cutting torch could cause wheat to smolder. The welders would have to be looking for it to detect it.
Venable's testimony on the plaintiff's theory of the explosion is as follows: the cause of the explosion and the fire which caused plaintiff's injuries was that the negligent cutting or welding by Jesco welders caused the wheat material on the inside of the bin to smolder, thus providing a source of ignition. Grain dust, of a combustible mixture, was created and was contained within the bin when the mill operation was restarted which was ignited by the smoldering wheat, causing a low order explosion. This initial explosion shook the building causing dust accumulated throughout the building to fall down through the various openings in the floors. The dust was drawn into one of the open flame gas dryers on the first floor of the mill. The open flame ignited the dust causing a large fireball to explode upward through the building. It was this fireball that burned the plaintiff and set off secondary explosions causing the destruction to the building.
The plaintiff, Robert Shannon, age twenty-nine years, with an eleventh grade education, was married and the father of two boys, ages six and one. His wife was expecting another child.
He was employed by Sunshine Mills five years prior to the explosion. He was the foreman in charge of running the twenty-five pound dog food line which required the sacking and lifting of the twenty-five pound bags of dog food. At the time of the explosion the only thing Shannon remembers is getting up and seeing fire as his clothing was burning. He sustained first, second and third degree burns over thirty-eight percent of his body. He was treated at North Mississippi Medical Center in Tupelo and later at the burn center at Delta Medical Center in Greenville for more than three months. He had to be sent to the University Hospital in Jackson for the removal of a catheter which had come loose and lodged in a vein in the upper part of his body. After his stay in Jackson, he was sent back to Greenville for further treatment. During his second stay in Greenville, skin grafts were taken from both legs and applied to the burned areas. A psychiatrist was seen by Shannon.
Shannon was in good health before the explosion. His recreational activities before the explosion included fishing, basketball, and baseball.
Mentally, Shannon was anguished after the explosion. He did not want to see his wife or mother because of his burns. He worried about his looks and medical expenses. He was at all times dependent on someone and needed assistance to use the bathroom, which caused embarrassment. *699 He also complained of flashbacks of the fire.
After getting home, Shannon felt further embarrassment. He was unable to hold his children. He walked with a limp and had to have help dressing.
Medical expenses include: $719.00 from North Mississippi Medical Center, $17,874.00 from Delta Medical Center  first stay, $1,420.00 from the University Hospital, $586.72 from Delta Medical Center  second stay, $420.00 from Dr. Jan T. Goff, $300.00 from Dr. Patrick Lehan, and $900.00 from Greenville Surgical Clinic, totalling $22,220.80.
Shannon returned to work at Sunshine Mill in November, 1980. His work was limited to janitorial duties such as sweeping and cleaning. He was unable to find other work. Darrell Smith, mill manager, agreed that Shannon could do the janitorial work. He allowed Shannon to rest when rest was needed and only required that Shannon work four days a week. Shannon did not want to go back to Sunshine but did so because he needed the money. For two months' work Shannon's gross pay in 1980 was $1,320.38. His gross wages in 1981 was $11,238.38 and in 1982, at the time of the trial, his takehome pay was $156.00 per week. At the time of the explosion Shannon's takehome pay was $140.00 per week for five days' work.
Shannon admitted that he would have been able to leave the hospital much sooner had the catheter not come loose. After getting home, he saw Dr. Benton Hilton in February and March of 1978. At that time Hilton suggested that Shannon go back to work, but Shannon elected not to go back until November of 1980. Shannon did not see Dr. Goff, a psychiatrist, until 1980 after this lawsuit was filed.
James Locust, plaintiff's half-brother, and Angie Shannon, plaintiff's wife, testified and corroborated much of Shannon's testimony concerning his medical treatment and physical inabilities.
Paul T. Oliver, Professor of Economics at the University of Mississippi, who is an expert in the fields of finance and economics, testified that Robert Shannon's life expectancy was 43.1 years and that his work life expectancy was 42.9 years. If Shannon worked for his normal work life expectancy, Oliver stated that his gross earnings would be $562,313.59. Total wage losses from the date of the explosion to the date of the trial equaled $40,423.43. Oliver testified that gross earnings of $562,313.59 must be discounted to its net present value of $214,293.75.
Dr. John C. Sandefur, a general surgeon, opined that Shannon had suffered a twenty percent impairment of function of the whole man. This does not take into consideration any physiological problems nor does it consider education, but is only concerned with anatomical disability.
William Furr, a professional in the field of vocational rehabilitation, was of the professional opinion that Shannon was not physically nor mentally capable of engaging in substantial gainful employment.
The defendant, Jesco Inc., called as its only witness, Keith Royer. Royer was the head of Fire Service Education at Iowa State University. Previous experience in grain dust explosions included somewhere between 50 and 150 incidents.
After hearing all of the testimony of those witnesses with knowledge of the occurrence, including Emerson Venable, Royer was of the opinion that there could not have been an explosion in the wheat bin. His opinion was based on the fact that when the mill process was restarted after the welding, a continuous flow of fuel entered into the bin. If a source of ignition were present with this continuing flow, a very violent explosion would have occurred which would have torn the bin into causing extreme damage on the second floor of the mill. Royer stated that the initial explosion did not occur in the wheat bin, but he could not offer any idea about where it may have occurred.

II.
(1) Turning to the first assignment of error, the appellant Jesco asserts that it *700 was entitled to a directed verdict in the absence of probative evidence that the Jesco welders were negligent and that their negligence caused the explosion.
The question presented is whether the evidence is sufficient to prove that Jesco caused the explosion.
The standard to be applied to a motion for directed verdict is set forth in the Paymaster Oil Co. v. Mitchell, 319 So.2d 652 (Miss. 1975).
(T)he court must look only to the testimony adduced for the plaintiff and accord truthfulness to it and indulge all favorable inferences that could be drawn therefrom, and if either is sufficient to support a verdict, then the motion for a directed verdict should be overruled. (319 So.2d at 655).
See also, General Tire and Rubber Co. v. Darnell, 221 So.2d 104 (Miss. 1969); Blackwell v. Dairymen, Inc., 369 So.2d 511 (Miss. 1979). The plaintiff's testimony as to the cause of the explosion came from its expert, Emerson Venable, upon which testimony the plaintiff's case must stand with other direct testimony from other witnesses. The appellant asserts that Venable's testimony is based upon speculation and supposition. Upon this proposition appellant relies upon Tombigbee Electric Power Ass'n v. Gandy, 62 So.2d 567 (Miss. 1953), a case in which there was no direct evidence or reasonable inferences upon which negligence proximately contributed to the damage could be based. The Court in Tombigbee, supra, held that inference upon inference could not support a judgment without evidence of a more explicit, direct, and satisfactory character.
In the case sub judice, direct evidence was introduced of (1) violations of the city fire code by Jesco welders; (2) presence of caked-on wheat inside the bin and smoldering within the bin; (3) welding into such caked-on wheat; (4) the giving off of hot slag and "BB's" when welding into metal with an acetylene torch; (5) a vertical weld position; (6) a presence of dust within the bin and the building during the operation; (7) a containment of wheat within the welded bin; and (8) an explosion and secondary explosions.
The appellant's assertion was that the expert's testimony involved speculation and conjecture as to the cause of the explosion. This Court has held that whenever facts are in dispute, or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is allowed. City of Jackson v. Locklar, 431 So.2d 475 (Miss. 1983).
The opinion of the expert Venable was supported by sufficient facts, which were not contrary to scientific principles or reason. Absolute certainty is not required for an expert witness. Gulf Insurance Co. v. Provine, 321 So.2d 311 (Miss. 1975).
Applying the Paymaster test to these facts we hold that there was probative testimony with its reasonable inferences upon which to sustain a judgment should one be returned by the factfinder. The motion for a directed verdict was properly denied by the trial court as resting upon reasonable probabilities and not upon mere possibilities.
(2) Was it error to refuse to instruct the jury that they must believe that the explosion was caused in the manner described by Venable or find for the defendant?
The following instruction was proffered by the defendant:
Instruction D10A
The court instructs the jury that the burden of proof is upon the plaintiff to prove by a preponderance of the evidence in this case that in the cutting operation on the wheat bin by Jesco, Inc. welders that hot slag was thrown into the wheat bin, that there was a residue of grain in said bin and that said hot slag came to rest in said grain residue and smoldered until after said bin was put back in operation, that it then ignited a mixture of air and wheat dust in said bin, causing a relative minor explosion, that this explosion caused dust to fall down and spread to the first floor where some of the dust *701 was drawn into the dryer where it was ignited; causing the fire ball and the major explosion; and if plaintiff has failed to meet such burden of proof, then your verdict must be for the defendant, Jesco, Inc.
The plaintiff objected asserting that his burden of proof was not correctly stated in that the plaintiff was not required to meet that great a standard. The court denied the instruction as being in conflict with one already granted having to do with circumstantial evidence.
The instruction, P-6, to which the trial judge referred is as follows:
The Court instructs the jury that in order to recover, the plaintiff is not required to show by direct evidence the exact source of ignition of the explosion at Sunshine Mills.
It is permissible for the plaintiff to introduce circumstantial evidence of the cause of the explosion, and if you can reasonably and legitimately infer from a preponderance of the evidence that the explosion was caused by the negligence of the defendant, Jesco, Inc., then you may find that the defendant, Jesco, Inc. was guilty of actionable negligence and if that negligence, if any, proximately caused or contributed to the explosion and resulting injuries of Robert Shannon, then you will find for the plaintiff, Robert Shannon.
The appellant's argument here is that the instruction required the jury to either find from a preponderance of the evidence that the explosion was caused in the manner theorized by Venable, or find for the defendant.
The rule of law which the appellant attempts to apply here is that the defendant Jesco is entitled to have the jury instructed on its theory presented in defense of its case. Sipe v. Farmer, 398 So.2d 1325 (Miss. 1981); Alley v. Praschak Machinery Co., 366 So.2d 661 (Miss. 1979). However, the refused instruction D104A did not address the defense's theory, but the plaintiff's burden of proof. Therefore, such law is not applicable here.
Instruction D10A, if granted, would have limited the jury's reasoning to those inferences which were listed. Instruction P-6 properly limits the jury's inferences to those which are reasonable and legitimate. For these reasons, this Court holds that the trial court did not err by refusing defendant's instruction 10A.
(3) Was it error to refuse defendant's instruction regarding its theory of independent intervening cause?
Instruction D17-A proffered by the defendant reads as follows:
The court instructs the jury that a superseding cause is an independent and unforeseen act which follows the defendant's negligence and which is the substantial factor in causing the plaintiff's injuries. A superseding cause becomes the proximate cause for the plaintiff's injuries, and the defendant's negligence is a remote cause for which he is not liable. Even if you should find from a preponderance of the evidence in this case that the defendant was negligent in its welding, if you also find from a preponderance of the evidence that the explosion of the dryer was an independent and unforeseeable act following the negligent acts of Jesco, Inc. and was a substantial factor in causing the injuries suffered by Robert Otis Shannon, then defendant, Jesco, Inc. is not liable for his injuries, and you must find your verdict for the defendant.
The trial court refused this instruction on the ground that it was not justified by the factual situation.
The intervening cause instruction was proffered in light of Venable's testimony that the gas dryers were dangerous and defective since they each lacked fire suppression devices. However, he concluded that although the devices would reduce the risk of fire, it would not necessarily prevent such an occurrence.
Jesco supports its argument with a long line of cases recognizing the doctrine of independent intervening cause in negligent actions. Saucier v. Walker, 203 So.2d 299 *702 (Miss. 1967); Louisville and N.R. Co. v. Daniel, 135 Miss. 33, 99 So. 434 (1924); Miss. City Lines v. Buelock, 194 Miss. 630, 13 So.2d 34 (1943).
The trial judge correctly concluded that factually, the doctrine was not applicable here. The independent action was described in Marqueze v. Sontheimer, 59 Miss. 430 (1882) as:
(T)hey are independent actors, and each is answerable for his own acts, because of the want of causal connection between the acts.
Assuming, as the instruction does, that the defendant was negligent, the cutting or welding put in motion a sequence of events which had not lost its identity and continuity when the injury occurred. Public Service Corp. v. Watts, 168 Miss. 235, 150 So. 192 (1933). Under the facts of this record the jury could have opted for any one of several alternatives as to what was the source of ignition.
Taking the instructions read as a whole the Court holds that the jury was properly informed and that no error was made by the trial judge.
(4) Was it error to allow the jury to view a video tape demonstrating burn treatment procedures?
The jury was allowed to watch a film of normal burn treatment procedures, but not depicting the treatment Shannon received. Prior to trial, a motion in limine was made by the defendant to exclude the film from evidence. The trial court permitted use of the film to describe normal burn treatment procedure and which was substantially the same treatment received by Shannon.
Motion pictures are admissible into evidence in Mississippi. Barham v. Nowell, 243 Miss. 441, 138 So.2d 493 (1962); Metropolitan Life Ins. Co. v. Wright, 190 Miss. 53, 199 So. 289 (1940).
The introduction of photographs and motion pictures is a matter for the sound discretion of the trial court and that court is afforded wide latitude in exercising this discretion. Niles v. Sanders, 218 So.2d 428 (Miss. 1969); Marr v. Nichols, 208 So.2d 770 (Miss. 1968). See also, Butler v. Chrestman, 264 So.2d 812 (Miss. 1972).
In Butler, an 8 MM movie film which "depicted an agonizing period during (the plaintiff's) recovery" was viewed by the jury as evidence of her pain and suffering. The Court reversed and remanded the case, holding that:
Where the only purpose of photographs is to influence and prejudice the jury they should be excluded, but where they visualize the injury at a stage subsequent to the accident, they may not be excluded solely because they may contain emotional overtones. Jensen v. South Adams County Water and Sanitation District, 149 Colo. 102, 368 P.2d 209 (1962), and Godvig v. Lopez, 185 Ore. 301, 202 (Id. at 816).
Caution again is stated to trial judges to preview such evidence to determine its probative value as against its prejudicial effects upon a jury.
The Court upholds here the trial court's discretion, and does not find an abuse of that discretion in his decision on this point.
(5) Was it error to allow expert testimony that the plaintiff had suffered a total loss of future wage earning capacity when the proof did not support total disability?
The testimony of several witnesses is relevant to this issue. First, Robert Shannon was advised to return to work by Dr. Benton Hilbun, his personal physician. Shannon stated that he was unable to do so at that time. Second, Dr. Sandefur testified that Shannon had suffered a twenty percent permanent physical disability, while Dr. Goff testified that Shannon suffered a ten to fifteen percent physiological disability. Third, William Furr classified Shannon as being totally disabled for gainful employment in the general job market. Fourth, Shannon returned to work as a janitor at Sunshine Mills in November, 1980, and was working there at the time of the trial. Furr's opinion was based on the *703 special consideration Shannon received that would not be available in the general job market.
The testimony which was objected to was that of the economist, Paul Oliver, who testified that Shannon's loss of earnings for the rest of his normal life was $562,313.89, which should be discounted to its net present value ranging from $173,870.33 to $256,703.50.
This Court has previously held that regarding recovery for permanent loss of wage earning capacity that in order to recover for permanent loss of wage earning capacity, there must be a showing of permanent physical impairment. Casey v. Texas Gas Corp., 361 So.2d 498 (Miss. 1978); Walters v. Gilbert, 248 Miss. 77, 158 So.2d 43 (1963); Kincade and Loftin v. Stephens, 50 So.2d 587 (Miss. 1951).
Such was shown of Shannon by two medical witnesses, one a surgeon, the other, a psychiatrist. A vocational rehabilitation expert testified that Shannon was totally disabled in the general job market. None of this testimony was objected to by the defendant, and factually this case falls within the stated principle. Defense counsel, through cross-examination, presented evidence of Shannon's present wages to be at least as much as his past earning. This fact does not take into account, however, the factor of inflation.
The thrust of this assignment is directed toward Dr. Oliver's testimony of total loss of wage earning capacity, when in fact, Shannon is working gainfully.
A similar question was addressed by the Wisconsin Court. In Kincannon v. National Indemnity Co., 5 Wis.2d 231, 92 N.W.2d 884 (1958), the plaintiff showed permanent disability through medical experts, but continued to work for the same employer at his pre-injury salary.
In affirming the jury verdict for the plaintiff, the Wisconsin Court acknowledged that:
While plaintiff's employer had not reduced his salary of $800 per month, the jury could well believe that he would be unlikely to participate in future pay raises, and that the hazard of being discharged or receiving a cut in pay was greatly increased. The fact that the employer had been generous to date of trial does not negative an impairment in earning capacity. Earning capacity is related to capacity to do the work and earn the salary, and may be impaired materially although the employer generously continues to pay the old rate. Prunty v. Vandenberg, 257 Wis. 469, 480, 44 N.W.2d 246; Olk v. Marquardt, 203 Wis. 479, 486, 234 N.W. 723. (Id. at 236, 92 N.W.2d at 887).
Also, McIntire v. Wallace, 44 Abs. 626, 64 N.E.2d 66 (1945); Southwestern Freight Lines v. McConnell, 254 S.W.2d 422 (Tex. Civ.App. 1952); City of Philadelphia v. Philadelphia Transp. Co., 400 Pa. 315, 162 A.2d 222 (1960).
We adopt the Wisconsin Court's holding on admissability of impairment of earning capacity. Therefore, we find no error in the admission of Oliver's testimony.
(6) Was it error to allow evidence of defendant's net worth in the absence of evidence justifying an award of punitive damages?
Plaintiff's attorney offered the balance sheet of Jesco Inc. into evidence. The balance sheet was objected to on the grounds that there had not been a sufficient case proven on punitive damages. The objection was overruled, and the balance sheet was admitted.
At this point, Greg Megginson, the vice-president of Jesco, was called to testify as an adverse witness. Megginson testified in front of the jury that Jesco's net worth was $3,216,000. The jury was dismissed from the court room. The weekend recess was taken and when court resumed the following Monday, the Court made the following ruling:
JUDGE: ... I am going to change my ruling of Friday afternoon to this extent, I am going to have the balance sheet that has already been introduced held in abeyance, I am going to let this one be marked *704 for identification and I am going to move on. I will decide at the end of all the evidence whether I am going to instruct the jury on the question of punitive damages or not and at that time if we need any clarification I will have time to think about it in the meantime, I will decide what is proper as far as any additional explanation is concerned... .
It is in evidence but I am not going to let the jury see it until I make up my mind at the end of all the evidence as to whether to instruct the jury on punitive damages or not.
At the close of all evidence the trial judge reversed his prior ruling on punitive damages, and no financial statement was viewed by the jury. He was not asked nor did he, admonish the jury to disregard the verbal statement testified as to the net worth of Jesco. Defense counsel's objection to the testimony, therefore, was sustained, and no punitive damage instruction was given. Other instructions on proper elements of damages were given.
No mistrial motion was sought by Jesco, and in the absence of such, no trial error is shown. Mars v. Hendon, 178 Miss. 157, 171 So. 880 (1937); Robertshaw Trustees v. Columbus & G. Ry. Co., 185 Miss. 717, 188 So. 308 (1939); U.S.F. & G. Co. v. Smith, 249 Miss. 837, 164 So.2d 462 (1964).
Jesco relies on Progressive Casualty Ins. Co. v. Keyes, 317 So.2d 396 (Miss. 1975), holding that evidence of its net worth was inadmissible where the jury was not warranted in awarding punitive damages. However, the case sub judice can be distinguished. In Progressive, the jury not only heard testimony of defendant's net worth, but were actually instructed that they could consider punitive damages.
This error, if error at all, was harmless and does not constitute grounds for reversal.
The cross-appeal likewise addresses this issue on punitive damages and asserts that the punitive damage instruction should have been granted with the supporting evidence of net worth of Jesco.
Punitive damages are allowable upon proof of gross negligence or willful misconduct. Mississippi Power Co. v. Jones, 369 So.2d 1381 (Miss. 1979); Fowler Butaine Gas Co. v. Varner, 141 So.2d 226, 244 Miss. 130 (1962).
The record here does not support a punitive damage instruction; therefore, the cross appeal is denied.
(7) The last assignment of error addresses the excessiveness of jury verdict of $1,024,268.00.
The standard of review for damages is set forth in pertinent part in Mississippi Code Annotated section 11-1-55 (Supp. 1972), as follows:
The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence... .
The above statutory standard for addressing additur or remittitur is whether the award by the factfinder was influenced by bias, prejudice, or passion, or contrary to the overwhelming weight of credible evidence. The same rule of law, above stated applicable to additur or remittitur, has been applied in determining if the amount of damages awarded is excessive. However, this Court in James Reeves, Contractor, Inc. v. Chain, 343 So.2d 1229 (Miss. 1977), stated:
The test for determining whether a verdict is grossly excessive is whether it evinces passion, bias and prejudice on the part of the jury so as to shock the conscience. Some of our cases have made the statement that the test is whether the jury responded to reason or whether the evidence justified the amount of the verdict. (343 So.2d at 1232).
*705 Therefore, the question for determination here is whether the award was so excessive to evince bias, passion or prejudice by the jury as to shock the conscience. Kinnard v. Martin, 223 So.2d 300 (Miss. 1969).
The excessiveness of damages and its application was discussed at length in one of this Court's recent decisions, Woods v. Nichols, 416 So.2d 659, 670 (Miss. 1982). Elements of damages discussed in Woods, supra include the degree of physical injury, mental and physical pain, present and future, temporary and permanent disability, medical expenses, loss of wages and wage earning capacity, sex, age, plaintiff's state of health, loss of use of limbs, disfigurement or mutilation of the body, the impact of inflation and change in the purchasing power of money and cost of living. Citing:

Mobile & Ohio Railroad Co. v. Carpenter, 104 Miss. 706, 61 So. 693 (1913); Kinnard v. Martin, 223 So.2d 300 (Miss. 1964); the loss of use of limbs, Memphis & C.R.R. Company v. Whitfield, 44 Miss. 466 (1870); Grenada Dam Contractors v. Patterson, 48 So.2d 480 (1950); disfigurement or mutilation of the body, Vascoe v. Ford, 212 Miss. 370, 54 So.2d 541 (1951); Rankin County v. Wallace, 230 Miss. 413, 92 So.2d 661 (1957); Jenkins v. Cogan, 238 Miss. 543, 119 So.2d 363 (1960); as to inflation, Kinnard v. Martin, 223 So.2d 300 (Miss. 1969) and Shaw v. Richardson, 392 So.2d 213 (Miss. 1980); as to the purchasing power of money and the cost of living. Louisville & N.R.R. v. Williams, 183 Ala. 138, 62 So. 679 (1913); Annot., 12 A.L.R.2d 611, § 11 at 636 (1950); 22 Am.Jur.2d Damages §§ 87, 365 (1965).
In the case sub judice, the plaintiff offered into evidence proof to support many of these elements which were properly before the jury. Each suit for personal injury must be individually decided upon its particular facts. Woods, supra. Undeniably, this plaintiff sustained serious and permanent injuries.
In the Woods case, supra, this list of cases from other jurisdictions evidences an increase in jury verdicts in personal injury cases as:

Deas v. Andrews, 411 So.2d 1286 (Miss. 1982) ($202,000 for loss of leg); Daniels v. Soder, 253 So.2d 849 (Miss. 1971) ($23,141.40 for fracture of leg); Fruit v. Schreiener, 502 P.2d 133 (Alaska 1972); ($635,000 for loss of one leg); Rediker v. Chicago, R.I. & P.R. Co., 1 Kan. App.2d 581, 571 P.2d 70 (1977) ($450,000 for loss of one leg); Gordon v. General Motors Corp., 323 So.2d 496 (La. App. 1975) ($467,000 for fracture to leg); Barlage v. The Place, Inc., 277 N.W.2d 193 (Minn. 1979) ($700,000 for loss of one leg); and Lamke v. Louden, 269 N.W.2d 53 (Minn. 1978) ($450,000 for loss of both legs).
Within our own jurisdiction recent judgments in elevated amounts reflect the same trend as in other parts of the country.
In view of the evidence of prior health and permanent injury in this record, and in deference to the role of the jury as the factfinder, this Court cannot hold that this verdict is so excessive as to evince bias, prejudice or passion on the part of the jury to shock the conscience. We affirm the verdict of $1,024,268.00.
We also affirm the trial court's ruling on punitive damages.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, DAN M. LEE, ROBERTSON and SULLIVAN, JJ., concur.
WALKER, P.J., and ROBERTSON, J., specially concur.
HAWKINS, J., not participating.
ROBERTSON, Justice, specially concurring:
I concur wholly in the opinion for the Court authored by Justice Prather and in the result reached. I write briefly because this day we decide another case arising out of the December 22, 1977 explosion at Sunshine *706 Mills. Jesco, Inc. v. Whitehead, 451 So.2d 706, 711-717 (Miss. 1984).
In the Whitehead case I have filed a specially concurring opinion. I there commented upon the testimony of John Sims, a consulting engineer who was called in rebuttal by plaintiff Whitehead. Sims hinted at a theory regarding the cause of the explosion which pointed the finger at Jesco. In the Whitehead case I have written:
Second, we have the testimony of John Sims, a consulting engineer who was called in rebuttal by plaintiff. Sims was asked his opinion regarding the most likely place for the ignition to have occurred. Sims answer was:
The most likely place would be in the wheat bin itself. As the ground wheat is falling out of the hammermill, the most likely place we are going to see explosive mixtures of air and wheat dust are in the wheat bin itself.
The problem here is that Plaintiff let the matter drop at this point. Mr. Sims never spells out just how, in his expert opinion, the explosion could have begun in the wheat bin. Accordingly, standing alone, Mr. Sims' theory (if we may call it that) is insufficient to sustain the verdict returned by the jury.
* * * * * *
We thus have a second hypothesis, in and of itself too speculative and undeveloped to support the verdict, but nevertheless suggesting that Jesco is the culprit. Candidly, we regard the Sims "theory" as more sensible than that offered by P.J. Lawson. Indeed, if plaintiff had fully developed the Sims theory, it may well have been sufficient to sustain the verdict in his favor. 451 So.2d 706 at 712-713.
In the case at bar what is in essence the "Sims theory" was fully developed. This was done primarily via the expert testimony offered by Plaintiff Shannon through Emerson Venable. Because of this substantial improvement and the quality of the expert proof offered by Plaintiff Shannon vis-a-vis that offered by Plaintiff Whitehead, I concur in the Shannon case that the Circuit Court correctly overruled Jesco's alternative motions for a judgment notwithstanding the verdict and for a new trial.
WALKER, P.J., joins this opinion.